## WALKER-SCOTT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 68946, 71606. Filed October 13, 1960.

*William L. Kumler, Esq.*, for the petitioner.
*James Q. Smith, Esq.*, for the respondent.

OPINION.

VAN FOSSAN, *Judge:* Respondent determined deficiencies in petitioner's income and excess profits taxes as follows:

| Dock-et No. | Fiscal year ended Jan. 31— | Kind of tax | Deficiency |
|---|---|---|---|
| 68946 | 1952 | Income | $1, 025.41 |
| 68946 | 1953 | Income | 35, 049.15 |
| 71606 | 1954 | Income and excess profits | 14, 088.26 |

Petitioner assigned as errors the respondent's determination of deficiencies in income taxes for the fiscal year ended January 31, 1953, and in income and excess profits taxes for the fiscal year ended January 31, 1954. The issue as ultimately stated by the parties is whether petitioner qualifies for relief under paragraph (b) (3) of section 444 of the Internal Revenue Code of 1939.[1]

All of the facts are stipulated by written agreement and are adopted and incorporated herein by this reference.

Petitioner is a California corporation, having its principal office in San Diego, California. Its Federal income and excess profits tax returns for the taxable years here involved were prepared on an accrual basis and were filed with the district director of internal revenue at San Diego, California.

Petitioner commenced a retail department store business in 1935 and has continued to date to conduct solely that business. At all times material to these proceedings petitioner carried on its business on leased land and in leased buildings.

From 1935 through January 31, 1950, petitioner's main store was in an 8-story building, having some 111,000 square feet of floorspace. Occupancy was pursuant to a lease dated June 11, 1935, as subsequently modified on April 23, 1945, and January 1, 1946.

From October 1, 1943, through January 8, 1953, petitioner, under a lease dated October 1, 1943, occupied a warehouse containing some 29,100 square feet of floorspace. On September 10, 1945, petitioner entered into a lease running from September 1, 1946, through August 31, 1961, covering the entire third and fourth floors of a building adjacent to its main store and comprising some 20,000 square feet of floorspace. This space was used by petitioner for additional direct selling to customers.

From April 1, 1947, through March 31, 1952, petitioner leased and occupied additional warehouse space comprising some 9,755 square feet under a lease dated January 23, 1947, and into such space petitioner moved from its main store building its carpenter shop and a

---

[1] All Code section references are to the Internal Revenue Code of 1939, unless otherwise stated.

portion of its storage of merchandise. The space so vacated in petitioner's main store was thereafter used in direct selling to customers.

On August 10, 1948, petitioner leased an additional 7,960 square feet of floorspace for a term of 2 years ending August 9, 1950. Into this space petitioner moved from its main store building its general accounting, purchasing, addressograph, and printing departments, together with storage of office and selling supplies. The space so vacated in its main store building was thereafter used in direct selling to customers.

The parties stipulated that—

The land, buildings and improvements thereon referred to in paragraphs 8–12, both inclusive, of this stipulation was real property held by petitioner in good faith for the purpose of its business, notwithstanding the same were held under lease.

During its base period years petitioner further increased storage space in its main store and in its warehouse by building balconies, shelving, and bins.

During the 36 months ending on the last day of its base period it purchased and installed in its main store new motorstairs to handle customer traffic between its first, second, and third floors. During this same period petitioner also purchased for use in its business additional cash registers, bookkeeping machines, Addressograph and Charga-plate machines, store fixtures, and furnishings.

The amounts of petitioner's basis, unadjusted, on January 31, 1947, and January 31, 1950, respectively, of its furniture and fixtures, equipment, trucks, and improvements to the leased property are as follows:

| | Unadjusted basis Jan. 31, 1947 | Net additions during year ended Jan. 31— | | | Total net additions Jan. 31, 1947, to Jan. 31, 1950 | Unadjusted basis Jan. 31, 1950 | Percentage of col. 6 to col. 1 |
| | | 1948 | 1949 | 1950 | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Furniture and fixtures | $187,563.38 | $156,538.69 | $40,045.61 | $76,409.83 | $272,994.13 | $460,557.51 | 245.55 |
| Equipment | 25,478.17 | 47,899.37 | 12,331.41 | 29,661.67 | 89,892.45 | 115,370.62 | 452.82 |
| Trucks | 5,754.37 | 4,071.90 | | 722.69 | 4,794.59 | 10,548.96 | 183.32 |
| Leasehold improvements | 163,466.08 | 165,406.80 | 2,289.79 | 35,283.26 | 202,979.85 | 366,445.93 | 224.17 |
| Total | 382,262.00 | 373,916.76 | 54,666.81 | 142,077.45 | 570,661.02 | 952,923.02 | 249.29 |

Without reference to any improvements made thereon by petitioner, it had no basis in its own right, adjusted or unadjusted, for determining gain upon a sale or exchange, in the leases or real property held under lease as of January 31, 1947, and January 31, 1950. The lessors' bases, unadjusted, for the land, buildings, and improvements held by petitioner under lease on those dates, were in excess of $1 million.

Petitioner's base period for purposes of determining its average base period net income and excess profits credit consisted of its 4

fiscal years commencing on February 1, 1946, 1947, 1948, and 1949, and ending on January 31, 1947, 1948, 1949, and 1950, respectively.

Its first taxable year under subchapter D of chapter 1 of the Internal Revenue Code of 1939 was its taxable year commencing February 1, 1950.

Petitioner's excess profits net income for the taxable years here involved was as follows:

Jan. 31—

| | |
|---|---|
| 1951 | $240,067.44 |
| 1952 | 335,947.95 |
| 1953 | 460,282.16 |
| 1954 | 398,074.36 |

Petitioner's "industry classification" for purposes of subsection (e) of section 444 was No. 53, General Merchandising. The amount of its "total assets" for purposes of section 444(c) and as defined in section 442(f) on the last day of its taxable year immediately preceding its first taxable year under subchapter D of chapter 1 was $2,414,475.69. The total amount of interest paid or incurred by petitioner in the 12 months ending with the end of petitioner's last taxable year preceding its first taxable year under subchapter D was $14,948.75.

In its original returns for the taxable years ended January 31, 1953 and 1954, petitioner computed its average base period net income and excess profits credits for those years and its excess profits credit carryovers to those years from its fiscal years ended January 31, 1951 and 1952, by applying the benefits of section 444(b)(3) of the Internal Revenue Code of 1939.

Petitioner does not qualify and does not claim to qualify for a determination of its average base period net income under either of paragraphs (b)(1) or (b)(2) of section 444. Petitioner claims only the benefits of a determination under paragraph (b)(3) of section 444.

Petitioner's correct income and excess profits tax liability for its taxable years ended January 31, 1951 and 1952, is not in issue in these proceedings and will not be affected by any determination herein.

Applications for the benefits of section 444 were filed by the petitioner with its returns for the taxable years ending January 31, 1953 and 1954.

Respondent determined deficiencies in income taxes for the fiscal years ending January 31, 1952 and 1953, and in income and excess profits taxes for the fiscal year ended January 31, 1954. The year 1952 was not placed in issue. The deficiencies for 1953 and 1954 were based in part on the disallowance of certain deductions from gross income.

Since no evidence was produced at the hearing nor any argument made on brief concerning respondent's action in respect of deductions for the fiscal years ending January 31, 1953 and 1954, petitioner is

deemed to have waived such issues. Accordingly, the deficiencies, to the extent that they arose from respondent's disallowance of the deductions in the years ended January 31, 1953 and 1954, must be sustained.

While the sole issue remaining is whether petitioner qualifies for relief under section 444, the parties, by stipulation, have further narrowed the issue to the following:

If the Court concludes as a matter of law that the basis, unadjusted, of its total facilities on the last day of its base period, i.e., January 31, 1950, and on the day prior to the beginning of 36-month period ending on such last day, i.e., January 31, 1947 must be computed by including the amounts of the lessors' bases unadjusted of the real property under lease to petitioner on such dates, then the Court should find that the basis unadjusted on January 31, 1950, was not 200 per centum or more of the basis, unadjusted, on January 31, 1947. But if the Court concludes as a matter of law that the basis, unadjusted, of its total facilities on such dates must be computed without including the amounts of such lessors' bases unadjusted of the real property under lease to petitioner on such dates, then the Court should find that the amount of the basis, unadjusted, of its total facilities on January 31, 1950, was 249.29 per centum of the amount of the basis, unadjusted, on January 31, 1947. * * *

Under the provisions of section 444 [2], relief based on an increase in

---

[2] SEC. 444. AVERAGE BASE PERIOD NET INCOME—INCREASE IN CAPACITY FOR PRODUCTION OR OPERATION.

(a) IN GENERAL.—If a taxpayer which commenced business on or before the first day of its base period establishes that, during the 36-month period ending on the last day of its base period, there was an increase, as defined in subsection (b), in its capacity for production or operation, the taxpayer's average base period net income determined under this section shall be the amount computed under subsection (c).

(b) INCREASE IN CAPACITY.—An increase in capacity for production or operation shall be deemed to have occurred, for the purposes of this section, if the taxpayer establishes that it made an addition or additions to its facilities (as defined in subsection (d)) or replaced all or a part of its existing facilities, and that:

(1) as a result of such additions or replacements, its capacity for production or operation on the last day of its base period was 200 per centum or more of its capacity for production or operation on the day prior to the beginning of such 36-month period, or

(2)(A) as a result of such additions or replacements, its capacity for production or operation on the last day of its base period was 150 per centum or more of its capacity for production or operation on the day prior to the beginning of such 36-month period, and (B) the adjusted basis for determining gain upon sale or exchange of its total facilities on the last day of its base period was 150 per centum or more of the adjusted basis for determining gain upon sale or exchange of its total facilities on the day prior to the beginning of such 36-month period, or

(3) the basis (unadjusted) for determining gain upon sale or exchange of its total facilities on the last day of its base period was 200 per centum or more of the basis (unadjusted) for determining gain upon sale or exchange of its total facilities on the day prior to the beginning of such 36-month period.

(c) AVERAGE BASE PERIOD NET INCOME.—The average base period net income determined under this section shall be computed as follows:

(1) By multiplying the amount of the taxpayer's total assets for the last day of its taxable year immediately preceding its first taxable year under this subchapter by the base period rate of return, proclaimed by the Secretary under section 447, for the taxpayer's industry.

(2) By subtracting from the amount ascertained under paragraph (1) an amount equal to the total interest paid or incurred by the taxpayer for the 12 months ending with the end of such immediately preceding taxable year.

(d) FACILITIES.—For the purposes of this section, the term "facilities" means real property and depreciable tangible property, held by the taxpayer in good faith for the purposes of the business.

capacity for production or operation requires a showing that (a) additions to or replacements of "facilities" have been made which result (b) in specified percentage increases in either physical capacity or bases (adjusted or unadjusted) for computing gain on the sale or exchange of the taxpayer's total "facilities." The term "facilities" is defined to mean real property and tangible personal property, held by the taxpayer in good faith for the purpose of the business. Sec. 444(d). The capacity increase must occur "during the 36-month period ending on the last day of its base period." Sec. 444(a).

One method of showing the required percentage increase in capacity, and the one in issue here, is satisfied if the *unadjusted* basis for determining gain upon sale or exchange of total facilities on the last day of the base period was 200 per cent or more of such *unadjusted* basis of the total facilities on the day prior to the beginning of the 36-month period. In short, what is required is that the total investment in facilities on the latter date be double that on the prior date. This subsection is aimed at helping taxpayers who encounter difficulties in showing an increase in their physical capacity for operations but who do make substantial investments in additional plants, equipment, tools, furniture, and fixtures. 96 Cong. Rec. 16770 (1950).[3]

If the taxpayer meets the detailed and specific requirements of the section, relief is to follow automatically. See 96 Cong. Rec. 16807 (1950); S. Rept. No. 2679, 81st Cong., 2d Sess., 1951–1 C.B. 252.

Petitioner does not claim to qualify under section 444(b)(1) or (b)(2), it being apparent from the stipulated facts that petitioner's physical capacity did not increase sufficiently to qualify under either of those subsections. Cf. *Studio Theatre Inc.*, 18 T.C. 548; *Copco Steel & Engineering Co.*, 31 T.C. 629.

The above-stated facts set out at length the additions made by petitioner to its facilities. Such additions include increased storage space, new balconies, shelving and bins, a new system of escalators, addi-

---

[3] Senator George, then chairman of the Senate Finance Committee, gave the following explanation of the relief provisions (96 Cong. Rec. 16770):

(C) CHANGES IN CAPACITY

A similar relief measure is provided for taxpayers which made substantial changes in their productive capacity during the base period. Such taxpayers are given the option to use an average base-period net income calculated by multiplying the base-period rate of return for the taxpayer's industry by the taxpayer's assets at the close of its base period. The taxpayer may qualify for this relief by showing an increase of 100 percent or more in its productive capacity by the close of the base period. Alternatively, it may show an increase of 50 percent or more in its productive capacity and an increase of 50 percent or more in the adjusted basis of the taxpayer's total facilities. *For the taxpayer who has difficulty in measuring changes in productive capacity, a third test is provided which is based exclusively upon a change in the value of its facilities.* To qualify under this test, the unadjusted basis of the taxpayer's total facilities after the change in its plant or equipment occurs must exceed by 100 percent or more the unadjusted basis of the facilities prior to that time. [Italics supplied.]

tional cash registers, bookkeeping machines, Addressograph and Charga-plate machines, and store fixtures and furnishings. These additions constituted a sizable additional investment during the base period.

Respondent does not dispute the investment but rather concerns himself with whether the additions satisfy the 200 per cent requirements of section 444(b)(3). This, respondent says, calls for a definition of "facilities." Certainly the items enumerated above fit in the category of "depreciable tangible property" set forth in section 444(d).

Respondent would also have us include petitioner's leaseholds within the meaning of the term. Respondent argues in support of his contention that petitioner stipulated that the leaseholds were "real property." With that contention petitioner disagrees.

Be that as it may, for the purposes of decision in this case we find it unnecessary to resolve this particular dispute since it was agreed that petitioner had a zero basis in the leases.[4]

Assuming that the leases are includible in the term "facilities," respondent goes further and argues that the lease interests must take the lessors' bases which here are in excess of $1 million. If the $570,661.02 net additions to petitioner's tangible personal property is combined with the lessors' bases, it is apparent that petitioner cannot show the necessary 200 per cent increase as required by the statute.

---

[4] Cf. Tarleau, "Commentary on General Relief Under the Excess Profits Tax Act of 1950," 50 Mich. L. Rev. 365 (1952), with Donnelly, "Special Problems in the Excess Profits Tax Relief Provisions," 12 Fed. B.J. 173 (1952). Tarleau made the following comments (at 390) :

Many service industries are excluded from the benefits of section 444 because increases in capacity resulting from the addition of intangibles are not covered. Such cases might involve department stores, advertising agencies, or other corporations for which the ability to do more business depends upon an increase in personnel rather than upon the addition of "real property" or "depreciable tangible property," as the statute requires. Similarly, an increase in capacity to do business due to an investment in an advertising campaign would not be covered. The same principle bars section 444 relief in two related categories of capacity increase. Where the physical additions consist of leased property, there would be no basis for this relief, since the holding of property required by the definition of qualified facilities in section 444(d) has been construed to mean ownership rather than possession for use, in connection, for instance, with the availability of the depreciation deductions.

On the other hand, in the article mentioned above Donnelly stated (at p. 189) :

In determining the aggregate facilities the includible "real property" *probably will include leaseholds.* While many leaseholds will have no basis, they may be vital in a determination of eligibility under section 444(b)(1) or (2) for the purpose of measuring capacity. [Italics supplied.]

See, also, Liles, "Excess Profits Tax Relief Provisions," U. Ala. Extension News Bull. (1953), at p. 49. Liles expressed the following views (at p. 58) :

In connection with the definition of facilities, at least one very interesting problem has arisen and that is whether leased facilities count in measuring increases in capacity. * * * Suffice it to say that I understand the Bureau has ruled in favor of counting leased facilities in determining an increase in capacity. On the other hand, leased facilities must have a basis before they can be taken into account in determining an increase in the basis of facilities or before they count in total assets for the purpose of computing the quantum of relief.

But accepting for the nonce respondent's premise, we can find no support for the theory that such interests should be included at the lessors' bases. The definition of "facilities" reads in terms of property *held by the taxpayer* in good faith for the purposes of the business." (Italics supplied.) In referring to property *held* by the taxpayer, it is a fair inference that the statute also meant the taxpayer's own basis in such property.

Similarly, section 444(b)(3)—the section under consideration—utilizes "the basis * * * of its [taxpayer's] total facilities." This language, coupled with the definition of "facilities," indicates that petitioner's own basis in the leases, assuming they should be included within the meaning of "facilities," is the measure contemplated. See Summary of H.R. 9827, The Excess Profits Tax Act of 1950, As Agreed To By The Conferees (Dec. 1950), p. 14. It was stipulated that the petitioner's basis here was zero. Petitioner's zero basis would have no effect in the computation of the required percentage increase.

We have carefully studied the applicable statutes, regulations, and legislative history for an expression of intent on this question. See H.R. 9827, 81st Cong., 2d Sess., introduced in the House, Dec. 1, 1950; H. Rept. No. 3142, 81st Cong., 2d Sess. (1950), p. 16ff.; H.R. 9827, 81st Cong., 2d Sess., introduced in the Senate, Dec. 6, 1950; S. Rept. No. 2679, 81st Cong., 2d Sess. (1950), p. 22; H.R. 9827, 81st Cong., 2d Sess., introduced in the Senate, as amended, Dec. 20, 1950; Conf. Rept. No. 3231, 81st Cong., 2d Sess. (1950), p. 20; Summary of H.R. 9827, The Excess Profits Tax Act of 1950, As Agreed To By The Conferees (Dec. 1950), p. 14; 96 Cong. Rec. 16770, 16738, 16807; and secs. 40.444–1 and 40.444–2, Regs. 130.

We find no provision, comment, hint, or intimation calling for the use of a "transferred" or "substituted" basis in determining whether a taxpayer qualifies under subsection (b)(3). The tenor of the statute and the repeated references to the "taxpayer's" or "its" interest in property or basis, indicate that Congress contemplated the use of the particular taxpayer's own basis or property interests (the taxpayer whose tax is being thus computed) and not a third party's basis in the property, in determining qualifications for relief.

We conclude that the basis, unadjusted, of petitioner's total facilities on the applicable dates should be computed without including the amounts of the lessors' bases, unadjusted, of the real property under lease to petitioner on such dates, and find, as agreed by the parties, that the amount of the basis, unadjusted, of its total facilities on January 31, 1950, was 249.29 per cent of the amount of the basis, unadjusted, on January 31, 1947.

*Decisions will be entered under Rule 50.*