REPPEL STEEL & SUPPLY CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reppel Steel & Supply Co. v. Commissioner
Docket No. 4088-72.
United States Tax Court
T.C. Memo 1976-86; 1976 Tax Ct. Memo LEXIS 314; 35 T.C.M. (CCH) 368; T.C.M. (RIA) 760086; March 22, 1976, Filed *314 Held, portion of compensation paid by petitioner to its three officers determined excessive, not for services rendered, and, therefore, not deductible under sec. 162(a)(1), I.R.C. 1954; respondent's determination sustained. James Powers, for the petitioner. Harold E. Patterson, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined the following deficiencies in petitioner's income taxes: *315 Year
Deficiency
1968
$ 48,232.91
1969
58,917.92
Concessions having been made by both parties, the only issue remaining is whether respondent erred in determining that a portion of petitioner's deductions on its 1968 and 1969 tax returns for compensation paid to its three officers was unreasonable and excessive and, therefore, not deductible under section 162(a)(1). [1]
At trial respondent objected to the admission of certain statistical data relating to the steel construction industry on the grounds of relevancy. Petitioner objected to the admission of evidence relating to contributions to its pension plan because the contributions had not been covered in the notice of deficiency. The Court reserved ruling on these objections and directed the parties to brief their positions. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Reppel Steel & Supply Co., Inc. (hereinafter petitioner) is an Arizona corporation engaged in the steel fabrication business. At the time of the filing of its petition herein its principal offices were located in *316 Phoenix, Ariz. For the taxable years in issue petitioner timely filed its corporate returns with the district director of internal revenue at Phoenix. Prior to its incorporation in 1954 petitioner was operated as a sole proprietorship by Robert Reppel (hereinafter Reppel). In 1954 Reppel and William Tizard (hereinafter Tizard) incorporated petitioner. Tizard had a degree in civil engineering from the University of Arizona and prior experience with the Corps of Engineers, the Bureau of Public Roads and the Bureau of Reclamation. At its inception petitioner was engaged only in the business of fabricating and installing reinforcing steel. Its physical assets consisted of two trucks and cutting and bending machines. In 1954 Tom Tracy (hereinafter Tracy), Reppel's son-in-law, went to work for petitioner as a truck driver and subsequently became a reinforcing steel salesman. While employed as a salesman Tracy would receive frequent requests from customers for steel structural components. Consequently, he suggested to Reppel that petitioner consider developing a structural steel division. Subsequently petitioner was organized under two divisions--a structural steel division and a reinforcing *317 steel division. The facilities of the two divisions were housed in adjacent buildings. Reppel, as president, was in charge of petitioner's overall operations. His duties included continued review of the financial aspects of the business, overseeing the payment of bills and collection of accounts receivable, and the general supervision and coordination of the work of the two divisions. Tizard was petitioner's secretary-treasurer and the general manager of the reinforcing steel division. His duties included preparing bids on fabrication jobs and the general coordination and supervision of the activities of his division. Tracy was petitioner's vice-president and the general manager of the structural steel division. His duties included selecting and bidding on prospective jobs, scheduling the work, doing the follow-ups and the general management of his division. All three officers devoted their full time and attention to petitioner's affairs. They regularly worked on Saturdays and Reppel worked on Sundays as well. During the years in issue Reppel worked about 60 hours a week, Tizard between 55 and 60 hours a week and Tracy between 60 and 70 hours a week. These three were petitioner's *318 only executive officers and the only employees having supervisory responsibilities with the exception of the hourly paid foremen who received overtime for working over 40 hours per week. The two divisions were operated in a similar fashion. Petitioner subscribed to various technical publications which contained information relating to construction projects on which bids were sought from subcontractors. Reppel, Tizard and Tracy would also receive information concerning new projects from general contractors with whom they had had prior dealings. Upon receipt of information concerning new projects the officers would ascertain whether or not a bid should be submitted. When a determination was made to submit a bid on a particular project the first step involved an examination of the architect's plans and specifications. The purpose of these examinations was to determine the exact scope of the particular subcontract. This would primarily involve the listing of raw material items needed (often known in the trade as a "take-off"). An estimate of the time required to fabricate the raw materials would thereafter be determined. In the reinforcing steel division this required the cutting and *319 bending of steel bars into appropriate lengths and shapes. In the structural steel division the raw materials included beams, angles, pipe and plates. These materials were fabricated into trusses, girders, columns and similar structures. The steel fabricating business is quite competitive. During the years in issue approximately 20 percent of the bids submitted by the reinforcing steel division and approximately 15 percent of the bids submitted by the structural steel division were accepted. Because of petitioner's past performance record it was sometimes awarded contracts even though it had not tendered the lowest bid. Once a contract was obtained blueprints were prepared showing the exact details and location of the steel components. The architect's plans and specifications provide only general dimensions, locations and other characteristics of the steel components and were not sufficiently complete to be relied upon for fabrication or installation. Both divisions employed draftsmen to prepare these blueprints (often known in the trade as "detailing"). These blueprints were submitted to the architect for approval and, after approval, transmitted to the respective plants where *320 the steel was fabricated. The raw materials needed were generally not purchased until the contract was obtained as it was the policy of the structural steel division not to maintain a substantial inventory of such items. In the reinforcing steel division the bars of reinforcing steel, after being properly cast and shaped, were shipped to the job site with instructions indicating their installation points. During the years in issue the reinforcing steel division employed six people in its administrative offices, 30 people in the fabrication plant and 15 draftsmen. Additional workers were hired to work at the different job sites depending upon the project. Generally the division employed an average of 60 iron workers at any one time. The structural steel division employed 15 people in its administrative offices and approximately 40 in its fabricating plant. As in the other division, the number of employees at each job site depended upon the extent of the work to be accomplished. As many as 60 iron workers were employed on a single project. The iron workers employed at each job site were not permanent employees. Petitioner's stock ownership has been as follows: STOCK OWNERSHIP
Reppel and
Institutional
Trustee
Co-trustees of
Year
Reppel
Wife's Est. [2]
Tizard
Tracy
Gates [3]
Others
1954
350
50
1
1957
450
150
20
1
1958
550
250
50
100
1
19 59
850
350
70
11
1960
1,000
450
90
21
1962
1,000
450
140
130
61
1963
396
604
450
140
1964
69 6
604
450
240
130
61
1965
696
604
450
240
130
64
1966
796
604
550
340
130
64
1967
859
604
551
340
130
1968 [4]
859
604
551
340
130
1969 [4]
859
604
551
340
130
Percentage of Ownership
1968
34.5
24.4
22.2
13.7
5.2
1969
34.5
24.4
22.2
13.7
5.2
*321 Since 1963, Reppel, Tizard and Tracy have been the only officers and directors of petitioner. Petitioner has paid its officers as follows: OFFICERS' COMPENSATION
Reppel
Basic
Deferred
Year
Salary [5]
Bonus
Comp.
Total
1956
$ 7,800.00
$ 10,105.00
$ $ 17,905.00
1957
10,400.00
7,600.00
18,000.00
1958
10,400.00
20,591.99
30,991.99
1959
20,200.00
13,218.26
33,418.26
1960
2 0,200.00
9,685.28
29,885.28
1961
20,200.00
11,640.66
31,840.66
1962
20,200.00
14,188.90
8,383.40
42,772.30
1963
25,783.66
23,850.00
11,520.92
61,154.58
1964
27,304.72
27,630.00
11,520.82
66,455.54
1965
26,100.00
50,05 8.53
11,675.27
87,833.80
1966
26,000.00
22,046.31
11,675.27
59,721.58
1967
26,000.00
28,568.08
11,248.83
65,816.91
1968
26,200.00
60,036.40
11,208.26
97,444.26 [6]
1969
26,100.00
86,076.16 [6]
11,345.33
123,521.49
Tizard
1956
$ 7,800.00
$ 10,105.00
$ $ 17,905.00
1957
10,400.00
7,600.00
18,000.00
1958
10,400.00
19,573.56
29,973.56
1959
20,200.00
11,693.92
31,893.92
1960
20,200.00
7,935.08
28,135.08
1961
20,200.00
4,186.00
24 ,386.00
1962
20,200.00
7,671.06
3,498.98
31,370.04
1963
22,398.46
14,575.00
4,219.87
41,193.33
1964
23,933.49
16,885.00
4,219.87
45,038.36
1965
24,154.08
30,591.33
4,584.14
59,329.55
1966
23,971.19
13,472.74
4,284.14
41,728.07
1967
23,400.00
13,013.83
4,128.04
41,052.93
1968
23,865.08
36,688.91
4,112.77
64,666.77 [6]
1969
23,773.63
43,038.08
4,163.07
70,934.78 [6]
Tracy [7]
1963
$ 17,739.33
14,575.00
1,819.50
34,133.83
1964
20,424.34
16,885.00
1,819.50
39,128.84
1965
20,037.08
30,591.33
1,819.5 0
52,447.91
1966
23,036.18
13,472.74
2,356.40
38,865.32
1967
23,400.00
13,013.83
2,270.55
38,684.38
1968
23,811.63
36,688.92
2,262.14
62,762.68 [6]
1969
23,702.34
43,038.08
2,289.81
69,030.23
*322 Total officer compensation and other relevant data for these years is reflected in the following chart: (1)
(2)
(3)
(4)
(5)
Net Profit
Percent
Percent
Total
Before Officers'
Officers'
Column 3
Column 3
[8]
Year
Income
Comp. & Taxes
Total Comp.
of Column 1
of Column 2
1956
$ 181,835.64
$ 37,031.97
$ 35,810.00
19.7
96.5
1957
247,073.36
45,770.02
36,000.00
14.6
78.6
1958
156,275.38
87,960.29
60,965.55
38.9
69.4
1959
218, 493.69
98,115.81
65,312.18
29.8
66.5
1960
255,105.78
84,342.00
58,020.36
22.8
68.9
1961
284,280.20
80,328.08
56,226.66
19.8
69.9
1962
319,250.50
100,532.13
77,712.37
24.4
77.7
1963
491,775.06
215,655.96
134,662.24
27+ 60+
1964
562,277.41
242,558.45
150,622.74
26.8
62.0
1965
721,287.29
375,255.86
199,611.26
27.9
54+
1966
617 ,125.96
217,883.79
140,314.97
22-2/3
64+
1967
812,523.28
229,630.39
145,841.21
17+
60+
1968
1,019,446.00
421,234.00
224,874.00
22
53.38
1969
1,109,723.00
517,544.00
263,527.00
24
50.92
*323 Other than these officers, the highest paid employee during 1968 was a structural yard superintendent who received $ 11,700, and in 1969, a salesman who earned $ 18,550. There was no bonus plan in effect for any of the employees of petitioner for 1963 through 1969 except for the three officer-director shareholders. In the early years of petitioner's existence the bonus paid to its officers was an irregular amount. However, in 1962, without formal action by the board of directors, the officers agreed that they would set aside 40 percent of the net book profits before income taxes as a management bonus to be spread between the three officers. Reppel usually received 45 percent with Tizard and Tracy each receiving 27-1/2 percent of the bonus. The following chart reflects additional data with respect to the bonus payout: ADDITIONAL DATA WITH RESPECT TO THE BONUS PAYOUT
(1)
(2)
(3)
(4)
Book Profits
Net Book
Percent
Bonus
Before Taxes
Accrued
Profit After
of Col. 2
to
Year
and Bonuses
Bonuses
Accr. Bonuses
to Col. 1
Reppel
1963
$ 132,302.95
$ 53,000.00
$ 79,302.95
40
$ 23,850.00
1964
153,518.71
61,400.00
92,118.71
40
27,630.00
1965
278,102.97
111,241.1 9
166,861.78
40
50,058.53
1966
122,479.47
48,991.79
73,487.68
40
22,046.31 1967
136,444.36
54,595.74
81,848.62
40
28,568.08
1968
333,535.58
133,414.23
200,121.35
40
60,096.40
1969
430,380.80
172,152.32
258,228.48
40
86,076.16
*324 Percent
Bonus
Percent
Bonus
Percent
of
to
of
to
of
Year
Total
Tizard
Total
Tracy [9]
Total
1963
45
$ 14,575.00
27.5
$ 14,575.00
27.5
1964
45
16,885.00
27.5
16,885.00
27.5
1965
45
30,591.33
27.5
30,591.33
27.5
1966
45
13,472.74
27.5
13,472.74
27.5
1967
52.4
13,013.83
23.8
13, 013.83
23.8
1968
45
36,688.91
27.5
36,688.92
27.5
1969
50
43,038.08
25.0
43,038.08
25.0
In determining the 40 percent figure, the officers were primarily concerned with leaving an adequate amount of working capital available for the business. The following chart reflects further relevant data with respect to petitioner: OTHER RELEVANT DATA
Gross
Gross
Taxable
Earned
Dividends
Year
Sales
Profit
Income
Surplus
Paid
1956
$ 462,576.24
$ 181,835.64
$ 1,221.97
$ 3,757.29
1957
567,970.78
246,990.11
9,770.02
10,596.31
1958
941,307.06
155,549.11
26,994.74
29,168.54
19 59
1,345,621.11
218,493.69
32,803.63
48,252.28
1960
1,907,933.81
241,428.34
26,321.64
64,207.29
1961
1,860,422.
249,772.43
24,101.42
79,127.04
29
1962
1,686,727.37
314,337.01
22,819.76
95,043.33
1963
2,598,142.34
485,684.66 80,993.72
136,458.11
1964
3,211,126.05
549,659.57
91,935.71
188,247.77
1965
3,442,458.18
712,618.90
175,644.60 272,541.58
1966
3,507,234.46
605,553.92
77,568.82
333,901.09
1967
3,853,798.04
800,389.25
83,789 .18
382,244.11
1968
4,352,466.92
1,006,504.67
196,359.92
471,583.92
1969
4,427,320.71
1,085,163.50
254,017.63
593,296.14
*325 The stated reason why dividends were not paid was because there were shareholders who were not employees. In lieu thereof, bonuses were paid to the shareholders responsible for the earnings. As noted in the stock ownership table, supra, for the years 1967 through 1969, the three officers and the trustees owned 94.8 percent and Mr. Gates, Mr. Reppel's son-in-law, owned the remaining 5.2 percent of the stock. Mr. Gates was not an employee. A comparison of petitioner's income with the industrywide average and with the income of other companies of a comparable size for 1968 and 1969 reflects the following: [10]
Comparison of selected 1968 and 1969 data with industry sample (American Institute of Steel Construction -- AISC)
I. Income before Federal Income Taxes as a Percentage of Sales REPPEL
AISC
Group
As Adjusted
$ 2.5MM - $ 5
MM
As Reported
by Respondent
Overall
Companies
1968
4.51%
5.91%
4.65%
4.94%
1969
5.73%
7.43%
3.51%
3.70%
II. Income after Federal Income Taxes as a Percentage of Net Worth AISC
$ 2.5MM - $ 5 MM
REPPEL
Group
Companies
1968
13.23%
6.68%
6.43%
1969
14.45%
5.32%
6.28%
*326 III. Income after Federal Income Taxes as a Percentage of Total Assets AISC
$ 2.5MM - $ 5 MM
REPPEL
Group
Companies
1968
7.21%
4.21%
3.95%
1969
8.28%
3.28%
3.80%
For the years in issue respondent allowed and disallowed the following amounts of compensation: Compensation - Amounts Allowed and Disallowed
[11]
1968
Basic
Pension
Officer
Compensation
Bonus
Plan
Reppel
$ 26,200.00
$ 60,036.40
$ 11,208.26
Tracy
23,811.63
36,688.91
2,262.14
Tizard
23,865.08
36,688.92
4,112.77
Totals
1969
Reppel
$ 26,100.00
$ 86,676.16
$ 11,345.33
Tracy
23,702.34
43,038.08
2,289.81
Tizard
23,733.63
43,038.08
4,163.07
Totals
1968
Officer
Total
Allowed
Disallowed
Reppel
$ 97,444.26
$ 70,198.25
$ 27,246.41
Tracy
62,762.68
47,962.73
16,650.58
Tizard
64,666.77
46,165.56
16,650.58
Totals
$ 164,326.54
$ 60,547.57
1969
Reppel
$ 123,521.49
$ 86,040.54
$ 37,480.95
Tracy
69,030.23
52,163.02
18,740.47
Tizard
70,934.78
50,361.05
18,740.47
Totals
$ 188,564.61
$ 74,961.89
*327 OPINION Respondent's determination has disallowed a portion of petitioner's deductions for compensation of its three officers for the years 1968 and 1969 as being excessive *328 within the ambit of section 162(a)(1). [12] The basic question presented is whether the amounts paid to Reppel, Tizard and Tracy as salary and bonuses constituted a "reasonable allowance * * * for personal services actually rendered." Whether the amounts paid to the three officer-director shareholders herein represent reasonable compensation for services actually rendered is "a question of fact to be determined on the basis of the particular circumstances in each case." Pepsi-Cola Bottling Co. of Salina, Inc.,61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir., Dec. 8, 1975, 37 AFTR 2d 76-369); Dielectric Materials Co.,57 T.C. 587, 591 (1972). The burden of proof is upon petitioner. *329 Botany Mills v. United States,278 U.S. 282 (1929); Rule 142, Tax Court Rules of Practice and Procedure.
In disputing respondent's determination, petitioner points out its quick expansion, due entirely, it claims, to the efforts of the three officers. Petitioner submits that owners who actually run their own company are more dedicated and profit oriented than nonowner executives and that, therefore, they are entitled to higher compensation. Petitioner also refers us to its performance record in comparison with the steel fabricating industry as a whole (both industrywide and with companies with $ 2.5 million to $ 5 million sales). Relying upon California Vegetable Concentrates, Inc.,10 T.C. 1158 (1948), petitioner further argues that its bonus formula was reasonable when adopted and not excessive during the years in issue. Finally, petitioner contends that we should consider not only how much each officer received, but also how much it paid overall for management services, submitting that $ 207,000 during 1968 and $ 245,000 in 1969 for managerial services was reasonable considering the corporation had over $ 4,000,000 in sales during each of *330 these years. Petitioner argues that it should not be penalized because it paid this amount to only three individuals rather than to 10 or 12 executives. It claims that although it could have set up a middle management, the three officers wanted to control every aspect of the business and were willing to devote the time and energy to do so. Relying upon Lewisville Investment Co.,56 T.C. 770 (1971), petitioner suggests that the amount of compensation paid for managerial services should be tested against the value of the services provided and not against the number of persons providing such services. Lastly, petitioner urges us not to consider the evidence offered by respondent relating to contributions to the retirement plan in determining whether the compensation was unreasonable on the grounds that such payments were deductible only under section 404 and not section 162, and that respondent has failed to raise this issue in his pleadings. Petitioner also argues that respondent has failed to raise in his pleadings the issue of whether the payments were for services actually rendered rather than as a disguised dividend. With regard to the question of proper pleading, *331 we are referred to Estate of Floyd Falese,58 T.C. 895 (1972). Petitioner also points out that respondent did not object to petitioner's formula when its returns for the years 1961 through 1964 were audited. Respondent counters petitioner's arguments by contending that the bonus had little relation to the services performed and that a portion thereof was a distribution of profits in the nature of a dividend. He points out that no dividends were ever declared even though the corporation had an earned surplus of nearly $ 600,000 in 1969. He also notes that the total compensation paid to the officers always exceeded petitioner's taxable income. He further refers us to the fact that while there was a substantial increase in total compensation during the year in issue as compared to the prior years there was little or no increase in the duties or time spent performing such duties. Respondent points out that there was no showing that the compensation was comparable to compensation paid by similar companies in the industry. Reliance is also placed upon respondent's general presumption of correctness, which presumption, respondent contends, petitioner has failed to overcome. *332 With respect to the disputed evidence relating to the steel fabricating industry offered by petitioner, respondent, relying upon Boyle Fuel Co.,53 T.C. 162 (1969), asserts that the evidence is not relevant since the charts only show comparisons of petitioner and the companies according to gross sales. There were no individual or area comparisons, nor were there any comparisons with respect to the compensation paid. He urges that the evidence relating to the pension plan contributions is admissible, relying upon Barton-Gillet Company v. Commissioner,442 F. 2d 1343 (4th Cir. 1971). Respondent submits that he is not raising a new issue since there is no attempt to increase the deficiency or disallow the deduction for the contribution; that such evidence is merely an additional factor to consider in determining the reasonableness of the compensation paid. Respondent agrees that petitioner's three officers have done a credible job in building up the company and that the three officers were dedicated, hardworking and skillful managers. Turning to the admissibility of the evidence relating to the pension plan contributions and the AISC comparisons, *333 we believe this evidence, in its entirety, is relevant and admissible. See Boyle Fuel Co.,supra.The question is not really one of relevancy as we see it, but rather one of what weight should attach to such evidence. Evidence of the pension plan contributions is just one of various factors that may be considered in determining reasonable compensation; it does not raise a new issue. See Boyle Fuel Co.,supra; cf. Mayson Mfg. Co. v. Commissioner,178 F. 2d 115 (6th Cir. 1949). As no new issue is raised, Estate of Floyd Falese,supra, does not require a shift in the burden of proof. With respect to the AISC tables, although relevant to demonstrate petitioner's performance against the industry averages, they can be given little weight since the comparisons are so general. Actual comparisons of the compensation paid by comparable companies would have been more meaningful. However, the tables do support petitioner's position that it performed well as compared to the industry averages (both as a whole and in the $ 2.5 million *334 to $ 5 million class). Petitioner's argument that respondent should not be able to raise the issue of whether the payments were "for service actually rendered" and not in lieu of dividends is clearly without merit. Although not as clear as could be desired, the statutory notice certainly does not exclude that issue. [13] It cannot be said that respondent is raising a new issue. Compare Estate of Floyd Falese,supra.
Petitioner's other procedural argument that respondent's audits of petitioner's 1961 through 1964 returns without objection to the amount of compensation paid should be given considerable weight cannot be accepted. See e.g., Ridgewood Provisions, Inc.,6 T.C. 87, 90 (1946). *335 Cf. George R. Tollefsen,52 T.C. 671, 681 (1969), affd. 431 F. 2d 511 (2d Cir. 1970), certiorari denied 401 U.S. 908 (1971). Furthermore, the fact that a compensation plan may be reasonable in one year does not preclude its becoming unreasonable in later years. As previously noted, what constitutes reasonable compensation is essentially a question of fact to be determined from all the circumstances presented. Anthony Mennuto,56 T.C. 910, 921 (1971). Contingent compensation plans may, or may not, be reasonable, depending upon the circumstances. See section 1.162-7(b)(2) and (3), Income Tax Regs.[14] See also Streckfus Steamers, Inc.,19 T.C. 1, 6 (1952). When the employees to whom the compensation is paid are in control of the corporation, the situation calls for close scrutiny. Dielectric Materials Co.,supra at 591. Among the factors to be considered, but not necessarily with equal importance, are those *336 listed in this quotation: Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. Ox Fibre Brush Co. v. Blair, 4 Cir., 32 F.2d 42, 45, 68 A.L.R. 696; Toledo Grain & Milling Co. v. Commissioner, 6 Cir., 62 F.2d 171, 172; Capitol-Barg Dry Cleaning Co. v. Commissioner, 6 Cir., 131 F.2d 712, 715. *337 The situation must be considered as a whole with no single factor decisive. [Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949).] The presumption referred to in Mayson Mfg. Co. is of no weight when the directors are the controlling shareholders and are setting their own salaries. Boyle Fuel Co.,supra at 169. *338 We have carefully considered all of the evidence and we have concluded that a portion of the compensation paid to each of the three officers for the years in issue was unreasonable. In our opinion petitioner has not overcome the presumption of correctness of respondent's determination. We, therefore, sustain respondent's determination. Given the evidence presented we cannot say that his determinations were arbitrary and unreasonable. Although all three shareholders were dedicated, capable and hardworking and clearly responsible for the success of their business, we have been given no standard to judge if their compensation was reasonable. Petitioner's failure to produce evidence of compensation paid by similar companies, while not fatal to its case, Faucette Co.,17 T.C. 187 (1951), is damaging. Cf. Wichita Terminal Elevator Co.,6 T.C. 1158 (1946), affd. 162 F. 2d 513 (10th Cir. 1947). This case involves a closely held corporation where there is a potential for the distribution of earnings under the guise of compensation for services rendered. See Klamath Medical Service Bureau,29 T.C. 339 (1957), affd. *339 261 F. 2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Although petitioner's bonus formula may have been reasonable when started, we have not been convinced that such formula remained reasonable during the years in issue. In this instance the compensation plan agreed to was not the result of an arm's-length transaction; the officers herein set their own salaries. Compare California Vegetable Concentrates, Inc.,supra.Therefore, the compensation must be viewed in light of the circumstances as they existed during the years in issue rather than as they existed at the time the compensation plan was established. See section 1.162-7(b)(2) and (3), Income Tax Regs., quoted supra at footnote 12. Even if we treat the managerial compensation paid as a whole, [15] we are given no standard to test that amount as to its reasonableness. *340 Moreover we do not believe that the total amounts paid by petitioner represented payments for services rendered. In our opinion a portion of the bonus paid to each officer was in substance a distribution of profits to each as shareholder. The amount of the bonus was set, not according to the value of the services rendered, but at a rate which would still allow an adequate amount of working capital for the business. In addition, no dividends were ever paid even though the corporation had an earned surplus of almost $ 600,000 in 1969 and a good growth record. Dividends were never declared, according to at least one of the officers, because he believed that only those shareholders responsible for the earnings should receive the benefits. [16]
*341 For the foregoing reasons, respondent's determination is sustained. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. In 1963 Mrs. Reppel died. Her interest in the stock is held in trust. Mr. Reppel and the Valley National Bank were the original co-trustees. The bank was subsequently replaced by Transamerica Title Insurance Company. Mr. Reppel is an income beneficiary, and his children and grandchildren are the remainder beneficiaries. ↩
3. Gates is another son-in-law of Reppel; he was not employed by petitioner. ↩
4. In 1968 and 1969 the outstanding stock was $ 100 par value stock and there were 2,480 shares representing an investment of $ 248,000.↩
5. Salaries were paid weekly and this accounts for the minor annual variations when the salaries were in the same range. ↩
6. The parties stipulated to these figures. They reflect minor errors in addition and an inconsistency with other stipulations. See footnote 11, infra.↩
7. Tracy did not become an officer until 1963.↩
8. There were only two officers prior to 1963 and three thereafter.↩
9. Tracy did not become an officer until 1963.↩
10. Derived from the American Institute of Steel Construction (AISC), a trade association for steel fabricators. During 1968 and 1969 there were 141 and 152 companies, respectively. Of these companies, 31 in 1968 and 38 in 1969 had a sales volume between $ 2.5 million and $ 5 million. The AISC apparently does not provide a comparison of compensation paid by the various companies.↩
11. The parties stipulated to these figures. Although there appear to be errors in addition in arriving at the total for Reppel for each year and in the amount in the disallowed column for Tracy and Tizard for each year, they are counterbalancing for 1968 and result in the same total amount disallowed. In 1969 the total disallowed differs by only $ 40 when the above-mentioned errors are corrected. It is noted that the amounts in the disallowed column for each of the three officers conform to those set forth in the notice of deficiency. It is further noted that Tracy's and Tizard's names may have been reversed. Since the parties have stipulated to these figures, have used them in exhibits and in their briefs, and since their correction does not change the total amount disallowed in 1968 and has an insubstantial effect on 1969, we will accept them as stipulated for all purposes in this case. It appears that any corrections the parties believe are necessary can be taken care of in a Rule 155 computation.↩
12. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;↩
13. A pertinent part of the statutory notice reads as follows: The deduction of $ 207,290.94 claimed as compensation of officers for the taxable year 1968 has been determined to be excessive to the extent of $ 60,547.57. An amount of $ 146,743.37 thereof as computed below is determined to be a reasonable allowance for salaries or other compensation for personal services actually rendered within the ambit of Section 162 of the Internal Revenue Code of 1954↩.
14. (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.↩
15. As to this approach see Lewisville Investment Co.,supra at 783, where we stated: In the light of the unique facts here presented, we think this approach is erroneous. Section 162(a)(1) is directed to the reasonableness of the compensation paid↩ by the taxpayer for the services actually rendered to it rather than to the taxability of the compensation in the hands of the recipients. In this case, the joint venture agreement did not specify the service to be performed by particular individuals. Rather it treated the Clements as a unit and the Balls as a unit, leaving to them the decision as to which ones of them would perform the services required for the enterprise, and how they would share the compensation paid to their respective units. We are not here concerned with how that compensation should be taxed in the hands of the members of each unit, but whether the total amount paid to each unit was reasonable. The situation is analogous to a joint venture providing management services for a corporation on a commission basis; in those circumstances the issue would be whether the total compensation paid for the services actually rendered was reasonable, not whether each member of the joint venture earned as much thereof as was allocated to him. * * *
16. In this regard we note particularly the following testimony of Tizard: Q What did you take into consideration when you set this forty percent figure as the bonus? A We were primarily concerned with keeping an adequate amount of working capital available to the business. * * * * *
Q Could you tell me why the corporation never paid any dividends since its inception through 1969? A Well, I can give you my opinion. I would say that a dividend hadn't been paid, because there were stockholders in the corporation that were not active in the management of the corporation. And the bonus was paid rather than a dividend because it's my opinion that the bonus was paid to people who were responsible for the earnings, rather than to those [who] had simply an investment in stock.↩