JAMES D. KENNEDY, JR., AND DOROTHY H. KENNEDY, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CHEROKEE WAREHOUSES, INC., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 9849–77, 9850–77.          Filed August 7, 1979.

*William L. Taylor, Jr.,* and *Robert G. Russell,* for the petitioners.
*Wesley J. Lynes,* for the respondent.

BRUCE, *Judge:* Respondent, in two statutory notices dated June 30, 1977, determined deficiencies in the Federal income taxes of the petitioners as follows:

| Docket No. | Petitioners | Taxable year ending | Deficiency |
|---|---|---|---|
| 9849–77 | James D. Kennedy, Jr., and Dorothy H. Kennedy ..... | 12/31/72 | $9,239.91 |
|  |  | 12/31/73 | 14,822.30 |
| 9850–77 | Cherokee Warehouses, Inc. ............................... | 7/31/73 | 108,271.53 |
|  |  | 7/31/74 | 87,862.04 |

Due to concessions by both petitioners and respondent,[1] the

[1] In docket No. 9849–77, petitioners James D. Kennedy, Jr., and Dorothy H. Kennedy have conceded the entire $9,239.91 deficiency for their 1972 taxable year as determined by respondent, while

only issues remaining for our decision are (1) whether payments by petitioner Cherokee Warehouses, Inc. (hereinafter Cherokee), to petitioner James D. Kennedy, Jr. (hereinafter James), were unreasonable compensation in excess of respondent's determination and thus not deductible under section 162(a)(1)[2] by Cherokee in either fiscal year ending (FYE) July 31, 1973, or FYE July 31, 1974; (2) whether such compensation, if found to be nondeductible as unreasonable, nevertheless qualifies under section 1348 as earned income to James in 1973; and (3) whether the expense of supplying James an automobile is deductible by Cherokee in both FYE July 31, 1973, and FYE July 31, 1974.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference.

Petitioners James and Dorothy H. Kennedy resided at Lookout Mountain, Tenn., during all times pertinent to this case. They timely filed joint Federal income tax returns for both 1972 and 1973 with the Internal Revenue Service Center, Memphis, Tenn. Dorothy is a party only by virtue of having filed the joint returns with James.

Petitioner Cherokee is a corporate continuation of a partnership composed of James' brother-in-law, Samuel R. Smartt (Sam) and James' father, James D. Kennedy, Sr. (J.D.), who founded the sole proprietorship from which the partnership evolved. Cherokee timely filed its corporate income tax returns for FYE July 31, 1973, and FYE July 31, 1974, on an accrual basis with the Internal Revenue Service Center, Memphis, Tenn. Located both then and now in Chattanooga, Tenn., Cherokee operates several warehouses in which it stores merchandise primarily for large distributors and manufacturers and acts as the local and southeastern United States distribution center of

respondent has agreed to a decrease in petitioners' taxable income for their 1973 taxable year of $6,720.32 relative to a deduction for certain drilling costs by partnerships from which petitioners received income. Therefore, a computation under Rule 155 will be necessary in docket No. 9849-77.

In docket No. 9850-77, petitioner Cherokee Warehouses, Inc., has conceded a $500 increase in taxable income for its taxable year ending July 31, 1974, due to a reduction of depreciation allowable as a deduction as determined by respondent. Thus, if the other issues in docket No. 9850-77 are decided for petitioner, a computation under Rule 155 will be necessary.

[2] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in question, unless otherwise noted.

these customers. Cherokee also derives a portion of its income from being an authorized dealer for the Allis-Chalmers Lift-Truck Division.

During the years in issue, stock in Cherokee was held as follows:

|  | Percent |
|---|---|
| J.D | 85.56 |
| James | 7.84 |
| James, as trustee for Mary K. Dunkerly, his sister | 6.60 |
| Total | 100.00 |

J.D., president of Cherokee since its formation, was in the manufacturing business until 1942. In that year, he sold the business but retained ownership in the related buildings, which he then rented to his successor. Using these same buildings, in 1947, J.D. and Sam entered a warehouse business partnership in which Sam would operate the business and J.D. would maintain the buildings. Income would be split evenly. However, losses sustained in 1950 were impairing the return J.D. received from his investment in the buildings.

In 1950, Cherokee was incorporated under the laws of Tennessee. Initial capitalization was a contribution of $25,000 from J.D., with the 250 shares of $100 par stock distributed 248 to J.D. and 1 each to James and Sam. At the beginning, these same three individuals were the officers and the only full-time employees of Cherokee.

Key to the incorporation of Cherokee was the implementation of an incentive compensation plan which would promote J.D.'s financial investment in Cherokee while rewarding those individuals operating the business without burdening the new corporation with large fixed salaries.[3] Under the original agreement, James, with Cherokee for the first time, and Sam were each to receive, in addition to a monthly salary of $400,[4] a monthly bonus

---

[3]Although a strong belief in incentive compensation was professed by petitioners, only one other employee, the manager of the Material Handling Division, received income under a contingent arrangement. He received 20 percent of the net profits of the division which handled sales of Allis-Chalmers Lift-Trucks.

[4]J.D. also received this salary, but none of the incentive bonus. The salary was increased to $750 per month beginning in FYE July 31, 1954.

of 20 percent of the excess of gross receipts over $1\frac{1}{9}$ times the monthly operating expenses,[5] and an annual bonus of 10 percent of the excess of gross receipts over $1\frac{1}{9}$ times the annual operating expenses. The operating expenses included the salaries for determining the monthly bonuses and included the salaries and monthly bonuses for determining the annual bonus. The net effect of this compensation agreement was that Sam and James each would receive 26 percent of the net profits of Cherokee, while Cherokee received the remaining 48 percent.

After incorporation, Cherokee entered into a lease with J.D. for the use of the buildings which had been used in the partnership. Under this lease, Cherokee would pay J.D. $700 per month plus 10 percent of the gross storage and rental revenues and would pay all taxes, insurance, and maintenance for the buildings, as well. These buildings, many of which were built before 1920, were not particularly suited for the warehouse business and required major repairs during the first year of operation. A large part of Cherokee's initial capitalization was used for these repairs.

While J.D., whose interest was strictly financial, was not active in the daily operations of Cherokee, James and Sam worked long hours, 6 days per week at the start, performing all of the necessary tasks of the business. Much of their time was spent soliciting warehouse business. When business was slow, they would try to sell merchandise to make a profit for Cherokee.

From the time he learned he had lung cancer in the spring of 1963 until his death in June 1964, Sam curtailed his activities in the business. James assumed the total responsibility for the operation of Cherokee during Sam's illness and was appointed general manager after Sam's death. To compensate James for the added responsibility, J.D. proposed a new incentive compensation plan, which James accepted. Instituted in August 1964, the new plan provided for James, in addition to a monthly salary of $1,000,[6] a monthly bonus of 25 percent of net operating income for the month exclusive of capital gains, charitable contributions and expenses such as interest, and an annual bonus of $12\frac{1}{2}$ percent of net operating income for the fiscal year, less

[5]The use of the fraction, to provide a reserve against losses, was abandoned after March 1951 for both monthly and annual bonuses, since the corporation had begun profitable operation by then.

[6]The salary was increased to $1,100 per month on Aug. 1, 1973.

prior monthly bonuses and adjusted as the monthly bonus base figures were. The subsequent agreement increased James' receipts from 26 percent to 34.375 percent of earnings and Cherokee's share from 48 percent to 65.625 percent of earnings.

During the years in issue, James participated in many tasks at Cherokee, such as: solicitation of new accounts; maintenance of existing customer relationships; pricing and negotiation of rates; recruiting, hiring, and training of key employees; daily warehouse activity supervision; management of receivables, payables, and major purchases; and formulation of corporate growth strategy. James' primary responsibility, however, was soliciting new business. Other areas, such as daily warehouse operations, building maintenance, bookkeeping and materials handling were controlled by five supervisors who reported directly to James. Some of the supervisors assisted James when he was soliciting business for their respective divisions of Cherokee. One supervisor also performed the duties of office manager and superintendent.

The principal thrust of Cherokee's business has been the servicing of large accounts. Although Cherokee has become a local leader in public warehousing, competition for the larger accounts has always been intense from both local and Atlanta businesses. Nevertheless, Cherokee has a number of large accounts, including those of Uniroyal and Pillsbury, which were secured during the years in issue through the solicitation efforts of James. The additional space needed to handle such large accounts has been provided throughout Cherokee's history by the construction of new space, for which James acted as general contractor to reduce building costs. One such addition was added in FYE July 31, 1974. James has also enhanced the ability of Cherokee to acquire and maintain large accounts through his active support of the passage of a 1961 Tennessee statute which excludes merchandise in transit from State ad valorem taxes. This statute has made warehousing in Tennessee, especially in cities which are near State boundaries, such as Chattanooga, attractive to customers from other States or with a national product distribution.

Demands are placed on James' available time, in addition to his working hours, to share his knowledge of warehousing with professional and educational groups. Since 1964, he has been an active member of the Southeastern Warehousemen's and Mov-

ers' Association, having been its treasurer, second vice president, first vice president and, in 1972–73, president and chairman of the board. Further, James has participated in seminars and conventions of the association, chairing committees and panels and writing articles for presentation to the membership. James has also been active in the American Warehouseman's Association, having served as chairman of the board in 1976–77. On several occasions, James has made speeches and presented papers before the National Council of Physical Distribution Management, an organization of traffic managers for large manufacturers and distributors. James has also led seminars in distribution management at Ohio State University and Michigan State University and has published many articles in warehousing trade journals.

During the years in issue, demands were also placed on James' time by certain civic and social commitments. In 1973, he was chairman of the local American Red Cross chapter. During both 1973 and 1974, James was the Commissioner of Fire and Police in Lookout Mountain, Tenn.; was on the advisory committee of the Industrial Committee of One Hundred; was active in the Chattanooga Chamber of Commerce; was a member of the Board of Directors of the local United Fund; was a member of the Board of Directors of the American Cancer Society; and served on a committee of the local Rotary Club. Further, since 1974, James has been on the Board of Trustees of the Girls' Preparatory School of Chattanooga.

Nevertheless, Cherokee grew, as did the compensation it paid. Cherokee's growth is briefly outlined below:

| FYE July 31 | Gross receipts | Net income | Income tax | Net Income after taxes | Net worth[1] |
|---|---|---|---|---|---|
| 1951 | $58,567 | $2,686 | $618 | $2,068 | $26,686 |
| 1952 | 144,670 | 29,419 | 11,123 | 18,296 | 45,310 |
| 1953 | 408,752 | 78,042 | 41,325 | 36,717 | 76,461 |
| 1954 | 208,376 | 22,520 | 6,756 | 15,764 | 86,704 |
| 1955 | 233,388 | 26,422 | 8,240 | 18,182 | 108,807 |
| 1956 | 315,630 | 37,846 | 13,585 | 24,261 | 132,964 |
| 1957 | 346,784 | 52,303 | 21,698 | 30,605 | 163,181 |
| 1958 | 331,273 | 38,254 | 14,392 | 23,862 | 186,615 |
| 1959 | 279,653 | 21,558 | 6,467 | 15,091 | 201,238 |
| 1960 | 353,994 | 37,678 | 14,092 | 23,586 | 226,774 |

| FYE July 31 | Gross receipts | Net income | Income tax | Net Income after taxes | Net worth[1] |
|---|---|---|---|---|---|
| 1961 | $439,851 | $50,154 | $20,580 | $29,574 | $255,154 |
| 1962 | 410,017 | 27,773 | 8,206 | 19,567 | 274,255 |
| 1963 | 517,330 | 65,327 | 27,972 | 37,355 | 312,776 |
| 1964 | 542,978 | 58,298 | 22,342 | 35,956 | 376,103 |
| 1965 | 588,520 | 96,684 | 39,792 | 56,892 | 428,385 |
| 1966 | 802,850 | 128,137 | 53,337 | 74,800 | 502,949 |
| 1967 | 1,057,228 | 198,754 | 86,800 | 111,954 | 611,683 |
| 1968 | 1,042,158 | 175,969 | 81,508 | 94,461 | 703,367 |
| 1969 | 1,335,779 | 239,939 | 115,962 | 123,976 | 824,181 |
| 1970 | 1,960,445 | 353,754 | 174,196 | 179,558 | 1,000,756 |
| 1971 | 2,058,033 | 367,184 | 171,248 | 195,936 | 1,193,709 |
| 1972 | 2,615,051 | 559,866 | 253,311 | 306,554 | 1,496,549 |
| 1973 | 3,655,696 | 739,253 | 312,335 | 426,919 | 1,919,457 |
| 1974 | 4,208,633 | 631,428 | 279,844 | 351,584 | 2,267,030 |

[1] Net worth is computed at capital stock plus unappropriated retained earnings.

All figures in these tables are the result of rounding. The increase in compensation paid was as follows:

| FYE July 31— | J.D. | Sam | James | Incentive portion of James' income[7] |
|---|---|---|---|---|
| 1951 | $4,800 | $6,255 | $6,255 | $1,455 |
| 1952 | 4,800 | 18,433 | 18,433 | 13,633 |
| 1953 | 18,100 | 49,072 | 49,072 | 44,272 |
| 1954 | 9,000 | 19,260 | 19,260 | 10,260 |
| 1955 | 9,000 | 23,350 | 23,350 | 14,350 |
| 1956 | 9,000 | 29,139 | 29,139 | 20,139 |
| 1957 | 9,000 | 37,738 | 37,738 | 28,738 |
| 1958 | 9,000 | 33,258 | 33,258 | 24,258 |
| 1959 | 9,000 | 22,389 | 22,389 | 20,904 |
| 1960 | 9,000 | 41,782 | 41,782 | 32,782 |
| 1961 | 9,000 | 47,252 | 47,252 | 38,252 |
| 1962 | 9,000 | 34,877 | 34,877 | 25,877 |
| 1963 | 9,000 | 48,471 | 48,471 | 39,471 |
| 1964 | 9,000 | 44,382 | 44,382 | 35,382 |
| 1965 | 12,000 | --- | 64,334 | 52,234 |
| 1966 | 12,000 | --- | 82,392 | 70,392 |
| 1967 | 12,000 | --- | 115,479 | 103,479 |
| 1968 | 12,000 | --- | 102,581 | 90,581 |
| 1969 | 12,000 | --- | 136,428 | 124,428 |
| 1970 | 12,000 | --- | 189,831 | 177,831 |

[7] The difference between James' income and James' incentive bonus is the salary received during the year. However, the discrepancy for 1959 is unexplained.

| FYE July 31— | J.D. | Sam | James | Incentive portion of James' Income[7] |
|---|---|---|---|---|
| 1971 | $12,000 | --- | $206,024 | $194,024 |
| 1972 | 12,000 | --- | 309,775 | 297,775 |
| 1973 | 12,000 | --- | 332,366 | 320,366 |
| 1974 | 12,700 | --- | 301,345 | 288,645 |

These figures shown are the total income amounts paid in the respective years, for Cherokee had no pension plan nor any profit-sharing plan for any of its employees. As for James, he did not have any agreement with J.D. relative to acquiring ownership of Cherokee in the future, nor did he hold any option from Cherokee to purchase additional Cherokee stock in the future. Further, since incorporation in 1950, Cherokee had paid only one cash dividend, which was in 1953. Meanwhile, for the 2 years in issue, the next two ranking officers of Cherokee, two vice presidents, were paid only $23,740 and $25,060 for FYE July 31, 1973, and $26,660 and $28,190 for FYE July 31, 1974.

During the years in issue, James, with his father, J.D., owned all of the stock in five other corporations as well, but James received no compensation from them. These businesses did not require any daily attention from James.

Based upon the above facts,[8] respondent has determined that the compensation paid James by Cherokee in excess of $108,000 and $120,000 for FYE July 31, 1973, and FYE July 31, 1974, respectively, is unreasonable and not deductible under section 162(a)(1). Further, respondent has determined that this excess is not earned income for maximum tax purposes within the meaning of section 1348.

To the contrary, petitioners argue that the compensation was paid James for valuable services, under a long-standing incentive arrangement which was valid and reasonable at the time of its creation after arm's-length negotiations. In the alternative, petitioners contend that the entire amount was paid to James for services rendered and, thus, qualifies as earned income within the meaning of section 1348, even if a portion of it is found unreasonable.

---

[8]Respondent offered evidence of another Tennessee corporation partially engaged in warehousing. However, since we do not regard that corporation as comparable to Cherokee, we have omitted any findings of fact concerning it.

OPINION

## 1. *Reasonable Compensation*

The deductibility of the compensation paid James depends upon the meaning of section 162(a)(1), which allows a deduction for compensation which was actually intended to be paid for the services actually rendered and which was reasonable for those services. Sec. 1.162–7, Income Tax Regs.; *Nor-Cal Adjusters v. Commissioner*, 503 F.2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; *Electric & Neon, Inc. v. Commissioner*, 56 T.C. 1324, 1340 (1971), affd. without opinion 496 F.2d 876 (5th Cir. 1974); *Klamath Medical Service Bureau v. Commissioner*, 29 T.C. 339, 347 (1957), affd. 261 F.2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Discerning the intent behind the compensation presents a question of fact, to be determined from all the facts and circumstances of the particular case. *Paula Construction Co. v. Commissioner*, 58 T.C. 1055, 1059 (1972), affd. without opinion 474 F.2d 1345 (5th Cir. 1973); *Electric & Neon, Inc. v. Commissioner, supra.* Reasonableness of the compensation amount also presents a factual question to be resolved within the bounds of the individual case. *Charles Schneider & Co. v. Commissioner*, 500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); *Pacific Grains, Inc. v. Commissioner*, 399 F.2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; *Levenson & Klein, Inc. v. Commissioner*, 67 T.C. 694, 711 (1977); *Pepsi-Cola Bottling Co. of Salina v. Commissioner*, 61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975); *Boyle Fuel Co. v. Commissioner*, 53 T.C. 162 (1969). The factors generally considered relevant in determining the reasonableness of compensation include:

the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [*Mayson Mfg. Co. v. Commissioner*, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.]

*Commercial Iron Works v. Commissioner*, 166 F.2d 221, 224 (5th

Cir. 1948), affg. a Memorandum Opinion of this Court; *Pepsi-Cola Bottling Co. of Salina v. Commissioner, supra* at 567–568; *Dahlem Foundation, Inc. v. Commissioner,* 54 T.C. 1566, 1579 (1970). Although we discuss only those factors upon which we place the greatest reliance, our conclusion is the result of evaluating the entire situation of the instant case in light of all of the above factors. No single factor is determinative. *Mayson Mfg. Co. v. Commissioner, supra.* Cherokee bears the burden of proof. *Botany Worsted Mills v. United States,* 278 U.S. 282, 292 (1929); Rule 142(a), Tax Court Rules of Practice and Procedure.

Petitioners' counsel points out that Cherokee's corporate return for FYE July 31, 1972, was audited by an agent of the Internal Revenue Service, in an earlier audit separate from that of the years in issue. Although the agent conducting the audit questioned the deduction for compensation paid James in that year, the return for FYE July 31, 1972, was accepted as filed. An argument of estoppel is not raised. However, petitioners' counsel does argue that the decision to accept Cherokee's return for FYE July 31, 1972, as filed, should be given at least the weight of an objective witness to the reasonableness of the compensation paid James for the years in issue. This we cannot do, for we would be inferring improperly that the decision to accept Cherokee's return for FYE July 31, 1972, as filed, was influenced more by the reasonableness of the compensation contract, than by any one of a myriad other equally possible reasons. It has long been settled that a contrary administrative determination in a prior year does not prevent respondent from determining a deficiency in a later year for the same taxpayer in a similar situation. *Robert R. Walker, Inc. v. Commissioner,* 362 F.2d 140 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; *Ward v. Commissioner,* 240 F.2d 184, 185 (6th Cir. 1957), affg. per curiam 25 T.C. 815 (1956); *Caldwell v. Commissioner,* 202 F.2d 112, 115 (2d Cir. 1953), affg. a Memorandum Opinion of this Court; *Rose v. Commissioner,* 55 T.C. 28 (1970); *Meneguzzo v. Commissioner,* 43 T.C. 824, 836 (1965); *Savage v. Commissioner,* 31 B.T.A. 633 (1934), revd. on other grounds 82 F.2d 92 (3d Cir. 1936). Therefore, absent any related judicial or quasi-judicial action, the result, or even the existence, of a separate audit of a tax return for a year not in issue here is immaterial.[9] More

---

[9]Contrary to the argument of the petitioners, the holding in *Seven Canal Place Corp. v.*

important is the relationship of Cherokee and James and its influence upon the amounts paid James during the years in issue.

A close examination[10] of the relationship of James and Cherokee shows that the high percentage of the contingent compensation arrangement was not representative of James' worth to Cherokee during the years in issue. While James was knowledgeable and widely recognized in the warehousing business of the southeastern United States, Cherokee was not as dependent upon his services during the years in issue as it was during its more formative years. Early in Cherokee's existence, James and Sam, as the only full-time employees, participated in every activity of the business, from manual labor to corporate strategy formation. However, as Cherokee grew, additional employees were hired to share some of the activities and responsibilities. During the years in issue, Cherokee had approximately 200 full-time employees. Therefore, although Cherokee had developed into a successful, growing corporation, its success during the years in issue was not attributable solely to James. In other words, James' share of the workload during those years did not reasonably command the excessive income distributed to him by the contingent compensation arrangement created 22 or 23 years ago. Cf. *Hammond Lead Products, Inc. v. Commissioner*, 425 F.2d 31 (7th Cir. 1970), affg. a Memorandum Opinion of this Court; *Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, supra.*[11]

Although section 1.162–7(b)(3), Income Tax Regs., states that an existing contract for services is generally adjudged reasonable or not by the circumstances "existing at the date when the contract for services was made, not those existing at the date

---

*Commissioner*, 382 F.2d 899 (2d Cir. 1964), does not apply here, for, in the instant case, there was no earlier compromise or other agreement entered into by respondent determining an acceptable level of compensation upon which petitioner Cherokee could rely. Instead, respondent merely decided not to contest the tax return of Cherokee for FYE July 31, 1972. Cherokee may not rely upon this action as an explicit, open-ended approval of every transaction represented originally on the uncontested tax return, which reappears on a later return.

[10]Because Cherokee was closely held, detailed study of the relevant facts is necessary. *Mennuto v. Commissioner*, 56 T.C. 910, 921 (1971). This close scrutiny is especially called for where the employee, to whom the salary was paid, controlled the affairs of the corporate employer, as James did. *Dielectric Materials Co. v. Commissioner*, 57 T.C. 587 (1972). The need for such an examination of the facts surrounding the payments to James is accented by the fact that Cherokee only paid one dividend, in 1953, throughout its 23-year history prior to the years in issue.

[11]See also *Reppel Steel & Supply Co. v. Commissioner*, 35 T.C.M. 368, 45 P–H Memo T.C. par. 76,086 (1976).

when the contract is questioned," the situation presented here was not the general case. The changes in the circumstances surrounding the compensation arrangement were sufficiently extensive to label as unreasonable and, thus, nondeductible under section 162(a)(1), the excessive portions of the resulting payments to James.

Even though Cherokee has evolved from a new corporation of 2 employees with a questionable future, to an established corporation of over 200 employees, the contingent compensation arrangement has remained substantially intact. In the beginning, James and Sam each received 26 percent of the increasing profits from 1951 to 1964. After Sam's death in 1964, the only revision of the arrangement increased James' share in the increasing profits to approximately 34 percent. This revised arrangement continued at the increased percentage during the years in issue even though executive responsibility was being shared with 5 other officers, and the operation of Cherokee was shared with 200 employees. *Pacific Grains, Inc. v. Commissioner, supra; Perlmutter v. Commissioner*, 44 T.C. 382, 402 (1965), affd. 373 F.2d 45 (10th Cir. 1967). As a result, James received over 5 times the total income received by the next three ranking executives of Cherokee for FYE July 31, 1973, and over 4½ times that sum for FYE July 31, 1974, despite the fact that he was sharing operational responsibility with these same individuals. Cf. *Lydia E. Pinkham Medicine Co. v. Commissioner*, 128 F.2d 986 (1st Cir. 1942), affg. a Memorandum Opinion of this Court, cert. denied 317 U.S. 675 (1942); *Sohmer & Co. v. United States*, 86 F. Supp 670 (S.D. N.Y. 1949).[12]

The disparity between James' salary and the salaries of the other executives cannot be explained by the fact that James was the "guiding genius" of Cherokee, nor by the fact that he spent all of his time with Cherokee.[13] While James' guidance was a material factor in the early years, it was not as material during the years in issue, and James was not the cornerstone of Cherokee's existence. Further, James' time was not spent solely with Cherokee. In addition to his normal work hours, James was

[12]See also *Saia Electric, Inc. v. Commissioner*, 33 T.C.M. 1357, 43 P-H Memo T.C. par. 74,290 (1974), affd. in an unpublished opinion (5th Cir. 1976), cert. denied 429 U.S. 979 (1976). James was one of only two employees on a contingent compensation arrangement. The other employee received 20 percent of the net profits of only the Material Handling Division of Cherokee, which he managed, while James received, in total, approximately 34 percent of all net profits of Cherokee.

[13]Contra, *Albert Van Luit Co. v. Commissioner*, 34 T.C.M. 321, 44 P-H Memo T.C. par. 75,056 (1975).

involved in many commendable civic activities and participated in the seminars of various professional groups and educational institutions. We do not regard these impressive activities as hindrances to James' performance for Cherokee, nor do we regard them to be of such benefit to Cherokee as to warrant the excessive amounts paid James as general manager.

Petitioners appear to stress accomplishments of James in years prior to those in issue in an implicit argument that he was being paid for those prior acts. On the contrary, James had already been rewarded for his earlier accomplishments. He received over one-fourth of the net profits of Cherokee from 1951 to 1964, and has received over one-third of the net profits since 1964. In fact, since the third year of Cherokee's existence, 1953, the aggregate of these payments has been greater than Cherokee's total net worth for each respective year. By 1972, Cherokee's net worth was almost $1.5 million while James' aggregate receipts were over $1.6 million. Further reward was not necessary.

However, this is not to say that James was not a valuable asset to Cherokee. He was the chief executive of a prosperous, growing business and, from time to time, would obtain new accounts for Cherokee. Therefore, we find that reasonable compensation for his services was $190,000 for FYE July 31, 1973, and $220,000 for FYE July 31, 1974.

## 2. *Maximum Tax on Earned Income*

A maximum tax on earned income is provided by section 1348. Section 1348 (b)(1)(A), in pertinent part, defines "earned income" as "any income which earned income within the meaning of * * * section 911(b)." In turn, section 911(b) defines "earned income" as:

wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered.

Compensation which qualifies as a "reasonable allowance * * * for personal services actually rendered" under section 162(a)(1) would also qualify as earned income for purposes of section 1348. However, the definition in section 911(b), explicitly excepts from

earned income distributions of earnings or profits which are unreasonable in amount for the services actually rendered, even if ostensibly paid to the taxpayer for those services. Therefore, the fact that the payments to James were for services rendered would not automatically cause the unreasonable portion of those payments to be earned income.

To determine the appropriate tax treatment of the excess payments in the hands of the recipient, James, we must determine the nature of those payments under the facts presented. Sec. 1.162–8, Income Tax Regs.; *Garrison v. Commissioner*, 52 T.C. 281 (1969). Since petitioners have failed to prove that the excessive payments were part of a reasonable compensation allowance, and since no other reason for the payments exists, we must view the excess received as a distribution of earnings and profits. Therefore, the excess payments are dividends, even though not in proportion to the ownership of Cherokee stock. *Garrison v. Commissioner, supra* at 286; cf. *Kennington Realty Co. v. Commissioner*, 8 B.T.A. 1030, 1035 (1927).[14] To find otherwise would eliminate the need to define "earned income" and would defeat the purpose of section 1348, for it would allow a corporation to distribute its earnings disproportionately as salaries to its stockholders, whose tax liability would be limited by the maximum tax provisions of section 1348. Meanwhile, the corporation, which otherwise would have paid nondeductible dividends, would be none the worse. In fact, the corporation would benefit if any of those "salaries" were deductible without challenge. The opportunity for such an abuse of the provisions of section 1348 will not be created here.

The portion of compensation paid to James and found to be unreasonable is not earned income within the meaning of section 911(b) and is not qualified to receive maximum tax treatment under section 1348. But cf. *Gay Gibson, Inc. v. United States*, 35 AFTR 2d 75–1483, 75–1 USTC par. 9460 (1975), adopted 207 Ct. Cl. 946 (1975).

### 3. *Automobile Expense*

Cherokee bears the burden of proving that the expenses of supplying James an automobile for FYE July 31, 1973, and July

---

[14]See also *Bone v. United States*, 46 F.2d 1010, 1011 (M.D. Ga. 1931).

31, 1974, are deductible. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. While Cherokee alleged in its petition that the automobile was used for business purposes, no further mention of the deduction was made by petitioner in its brief, save for an objection to respondent's requested finding of fact that the car was used personally. This alone will not suffice. No other statements or arguments were made, nor evidence presented at trial by petitioner to support the deduction. Therefore, we must regard this issue as abandoned by petitioner. *Bussabarger v. Commissioner,* 52 T.C. 819, 829 (1969); cf. *Walker-Scott Corp. v. Commissioner,* 35 T.C. 34, 37–38 (1960). Respondent's determination of this issue is sustained.[15]

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[15]Whether the value of the automobiles supplied was additional income to James for the years in issue is not before us.