WEAVER PAPER CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weaver Paper Co. v. Commissioner
Docket No. 9272-77.
United States Tax Court
T.C. Memo 1980-72; 1980 Tax Ct. Memo LEXIS 511; 39 T.C.M. (CCH) 1233; T.C.M. (RIA) 80072; March 17, 1980, Filed *511 Held, compensation paid to petitioner's principal officer and stockholder was reasonable in amount and was paid for services rendered; hence, it is fully deductible under sec. 162(a)(1), I.R.C. 1954. William S. Duke and Richard A. Ball, Jr., for the petitioner. Thomas R. Thomas, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined the following deficiencies in petitioner's income taxes: FYE
June 30,
Deficiency
1974
$32,456.79
1975
47,181.26
The only issue for decision is whether payments made by petitioner to T.W. Weaver, Jr., during each of the taxable years in excess *512 of the $125,000 amount allowed by respondent constituted reasonable compensawtion fully deductible by petitioner under section 162(a)(1), I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts were stipulated and they are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Weaver Paper Co., Inc. (hereinafter petitioner) was incorporated on October 2, 1959, under the laws of the State of Alabama. At the time it filed its petition herein, its principal place of business was Montgomery, Ala. Petitioner is an accrual basis taxpayer and it filed its corporate tax returns for the taxable years in issue on a July 1-June 30 fiscal year basis with the Internal Revenue Service Center, Chamblee, Ga.
The moving force behind petitioner's operation was T.W. Weaver, Jr. (hereinafter Weaver). At all times relevant to this case, Weaver owned 97 percent of petitioner's common stock (its only class of stock), and he was petitioner's chief executive officer and chariman *513 of the board. The remaining stock in petitioner was owned by Weaver's wife. Weaver was 61 and 62 years of age during the taxable years in issue. He began work in the paper industry in 1933 with the Strickland Paper Co. During his employment with Strickland Paper Co., Weaver became a salesman, a position he held until he terminated his employment in 1947. In 1947 Weaver was hired by the S. P. Richards Paper Co. to run a branch of its operations in Montgomery, Ala. He had virtually the same selling area (Alabama, western Georgia, and portions of Florida) as he had with Strickland Paper Co., and he was paid 65 percent of gross profits to operate the branch. In addition to selling paper products, Weaver also performed every other needed job, including establishing contacts with paper suppliers. In 1952 Weaver purchased the branch from the S. P. Richards Paper Co. and renamed it the Weaver Paper Co. This company was operated as a sole proprietorship until it was incorporated in 1959. The principal business of both petitioner and its predecessor was the sale of fine printing paper and paper products at wholesale to printing companies and office supply concerns in Alabama and *514 Western Georgia. Petitioner was a distributor of paper products it obtained from paper manufacturers; petitioner did not manufacture any products. The following table sets forth the gross receipts, gross income, taxable income, and dividends paid by the petitioner for the years ended June 30, 1970, through June 30, 1975: Year
Gross
Gross
Taxable
Dividends
Ended
Receipts
Income
Income
Paid [2]
6/30/70
$1,617,666
$327,648
$ 76,593
$ 4,970
6/30/71
1,813,269
384,568
87,148
4,970
6/30/72
1,997,867
425,219
92,550
4,970
6 /30/73
2,163,327
493,433
132,776
4,970
6/30/74
2,703,936
709,621
191,095
4,970
6/30/75
2,916,622
813,321
255,526
13,860
Petitioner's retained earnings as of June 30, 1973, June 30, 1974, and June 30, 1975, were $375,259, $448,751.10, and $577,571.49, respectively. As was the case both during the taxable years in issue and the preceding years of petitioner's and its predecessor's existence, Weaver was involved in every aspect of the business operation. He acted as both salesman *515 and executive-manager, as well as filling in wherever necessary in petitioner's operations. His managerial duties included: Supervising sales, credit, billing, shipping, and inventory buying; maintaining contacts with paper sources; supervising warehouse operations; and anticipating customers' needs. Weaver also made sales calls on customers. His typical work schedule was from 6:30 a.m.-6:00 p.m., Monday-Friday, and he also regularly worked on Saturday and Sunday. Weaver had an excellent reputation in the paper industry for running a fine operation and for being a resourceful salesman. As a result of Weaver's efforts, petitioner carried a number of quality paper-product lines. The product lines eventually acquired by petitioner had been initially obtained by Weaver when he worked for Strickland Paper Co. and S. P. Richards Paper Co. Weaver had been able to maintain these contacts throughout the years. It was Weaver's opinion that, if he left the employ of petitioner in order to work for a new paper distributor, he could take virtually all of petitioner's sales accounts with him. For the taxable years prior to those in issue, Weaver received the following amounts of compensation *516 as salaries and bonuses from petitioner: FYE
June 30,
Compensation
1970
$67,278
1971
82,000
1972
82,000
1973
97,000
For the fiscal year 1973, Weaver's compensation included a base salary of $50,000, the remainder being comprised of bonuses. No specific breakdown was provided for the other years. On September 14, 1973, at the regular meeting of petitioner's board of directors, Weaver's salary was set at $100,000 per year for the taxable year July 1, 1973-June 30, 1974. On March 10, 1974, at a special meeting of the board of directors, it was agreed between petitioner and Weaver that, effective July 1, 1973, Weaver was to be paid an annual salary of $100,000 plus a bonus of 30 percent of petitioner's net profits before deductions for Federal and State income taxes and payments to any pension or profit-sharing plan. The agreement provided that Weaver's duties consisted of those performed previously, including "management and outside salesman duties." Pursuant to this salary and bonus agreement, Weaver received compensation of $192,618 for the fiscal year ending June 30, 1974, and $223,294 for the fiscal year ending June 30, 1975.These amounts do not *517 include deferred compensation in the form of payments to petitioner's profit-sharing plan, which payments approximated $10,000 in each of the years. [3]
The work which Weaver performed during the taxable years in issue was not substantially greater than that performed in earlier years, although petitioner's sales increased during this period and as sales increased so did business problems. Weaver did not acquire for petitioner any substantial new accounts during either taxable year. During the taxable years in issue, petitioner had 13-14 employees [4] in addition to Weaver. One of these employees, Charles Norris, acted as the office manager and supervised two other office workers during Weaver's absences. He was also petitioner's secretary-treasurer. Norris received compensation of $14,300 in the fiscal years ending June 30, 1974, and $15,800 in the fiscal year ending June 30, 1975. Included among 13-14 other employees of petitioner *518 were 4-5 other paper salesmen. For the most part these salesmen had little experience in selling paper products prior to being hired by petitioner and, with one exception, they had worked for petitioner for only short periods of time prior to the taxable years in issue. One salesman had started his employment with petitioner 15-16 years prior to the taxable years in issue, although this employment had been interrupted for an undisclosed period. Weaver hired these salesmen principally to service customer accounts which Weaver had developed but which he could no longer adequately maintain because of the quantity of petitioner's business. Although he no longer serviced the accounts handled by these other salesmen, Weaver still maintained contact with the customers by telephone or by personal visits. Few new accounts were established by these salesmen. The following table sets forth the respective total sales figures of Weaver and the other salesmen for the taxable years in issue: FYE June 30,
FYE June 30,
1974
1975
Weaver
$1,592,624.74
$1,750,393.17
Other salesmen
1,137,429.15
1,223,168.21
The salesmen hired by Weaver were paid a base sawlary and *519 a bonus of 10 percent of the net profits from their individual accounts. Automobiles were also provided to these salesmen and they were reimbursed for expenses. Because of the imprecise nature of the evidence, it can only generally be said that these salesmen annually earned between $10,000 and $22,000 during the taxable years in issue. Paper Merchant Performance, 1974, is a publication printed by the National Paper Trade Association, Inc., which provides industry-wide statistical data on paper merchant operations. Southeastern Paper Co. (hereinafter Southeastern), Louisville, Ky., and Strickland Paper Co. (hereinafter Strickland), Birmingham, Ala., are wholesale paper merchants similar to petitioner. For purposes of comparison, the following chart sets forth relevant data concerning: (1) Petitioner's operations for the two fiscal years in issue; (2) other printing merchants' operations (those located other than in Chicago, Detroit, New York, and Philadelphia) most comparable in size to petitioner as contained in the Paper Merchant Performance, 1974; [5] (3) Southeastern's operations for two fiscal years ending in 1974 and 1975; and (4) Strickland's operations for the two calendar *520 years 1974 and 1975. [6]
National
Weaver
Weaver
Average
FYE June 30, 1974
FYE June 30, 1975
1974
Gross
Receipts
$2,703,936
$2,916,622
$5,151,942
Cost
of
good
sold
$2,046,958
2,180,325
4,151,693
Gross
Profit
656,978
736,297
1,000,249
Operating expense
462,776
505,452
725,093
Net operating profit
194,202
230,845
275,156
Net profit before taxes
194,083
263,144
282,225
Net income after taxes
103,686
142,680
145,936
Southeastern
Southeastern
FYE Sept. 30, 1974
FYE Sept. 30, 1975
Gross Receipts
$8,393,572
$7,619,251
Cost of goods sold
6,940,130
6,179,436
Gross Profit
1,453,442
1,439,815
Operating expense
1,305,823
1,338,256
Net operating profit
147,619
101,559
Net profit before taxes
90,036
50,005
Net income after taxes
50,081
36,512
Strickland n6a
Strickland
1974
1975
Gross Receipts
$2,611,000
$2,386,000
Cost of goods sold
*
*
Gross Profit
660,247
588,543
Operating expense
* n6b
*
Net operating profit
*
*
Net profit before taxes
*
*
Net income after taxes
75,813
48,827
*521 A comparison of the foregoing information reveals petitioner as one of the more successful operations for its size. Weaver is due a large part of the credit for this success. Henry Harris (hereinafter Harris) was chairman of the board of Southeastern, and he was paid approximately $67,000 annually during the period at issue. Harris had been in the paper business since 1947, and he owned 50 percent of the stock of Southeastern. As chairman of the board, he worked 40 hours per week, primarily performing executive duties, although he did maintain a few sales accounts. Harris was also on advisory committees for a number of paper mills. Southeastern carried many of the same paper product lines as petitioner, although it had a larger volume of "direct business" [7] than did *522 petitioner. Southeastern paid its salesmen a percentage of the gross profit (selling price less cost of goods sold) [8] derived from their sales. The commission percentage varied from 25 percent to 45 percent, depending on a variety of factors, including the salesman's experience. A salesman who was given existing sales accounts did not receive as large a commission percentage as did the salesman that developed the accounts. Southeastern did not pay base salaries to its salesmen. Southeastern's top salesman earned approximately $65,000 in fiscal year 1973 and $75,000 in fiscal year 1974 on sales of approximately $1.2-$1.3 million. He was paid on a 30-percent basis.Harris would pay a 35-percent to 40-percent commission to a salesman who had new sales in the quantity and quality of paper that Weaver's sales approximated *523 in petitioner's fiscal year ending June 30, 1975. Such a salesman in Harris' opinion would be worth $175,000 to $180,000 per year for only selling. Harris would not require the individual to perform any management functions. Furthermore, it was Harris' opinion that the individuals who performed those jobs for Southeastern that Weaver performed for petitioner earned approximately $268,500 in 1973 and $293,500 in 1974. Having heard the evidence presented at trial concerning the success of petitioner's business and the efforts of Weaver, and based on his business judgment, Harris considered Weaver to be worth the compensation paid to him during the taxable years in issue.If he had performed the same duties for Southeastern that he performed for petitioner, Harris would have paid Weaver more than petitioner had. George B. Elliott (hereinafter Elliott) was president of Strickland, and he received compensation of $50,129 for 1973, $52,389 for 1974, and $84,118 for 1975. This compensation consisted of a salary of $36,000 and a bonus of 25 percent of the profits. Elliott had been in the paper business for over 20 years and he was the controlling shareholder of Strickland. As president, *524 he worked a 40-hour week, principally performing executive duties. Strickland also employed an office manager and a credit-manager bookkeeper to perform some of the administrative functions.In total, Strickland employed about 20 people. In addition to his executive duties, Elliott also did some selling.During the calendar years 1973-1975, Elliott's sales approximately amounted to $360,000, $443,000, and $536,000, respectively. These figures represented between 20 percent and 30 percent of Strickland's Birmingham sales. With the exception of Trainees, who were initially paid a salary, Strickland also paid its salesmen a percentage of gross profits instead of a base salary. The percentage paid to a salesman varied from 26 percent to 34 percent, again depending on a variety of factors. In Elliott's opinion, if Weaver brought $1,750,000 of quality paper sales to Strickland, Weaver would rate a commission percentage of 30 percent and would earn approximately $150,000. Elliott also would not require such a salesman to perform any management functions. In the statutory notice of deficiency respondent determined that $125,000 was reasonable compensation for Weaver for each of *525 the taxable years in issue. The remaining amounts paid to Weaver were determined to be unreasonable and the deduction thereof by petitioner was disallowed. No evidence was introduced concerning the basis on which respondent made his determination. ULTIMATE FINDING OF FACT The compensation paid to Weaver in each of the taxable years was reasonable in amount. OPINION The sole issue for decision is whether payments made by petitioner to Weaver, petitioner's president and chairman of the board, in each of its taxable years ending in 1974 and 1975, constituted compensation which was reasonable in amount and, therefore, deductible under section 162(a)(1), to the extent that the payments exceeded the $125,000 amounts allowed by respondent. Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered" when such allowances are "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." In order to be deductible, compensation must be both reasonable in amount and in fact paid purely for services. [9]Sec. 1.162-7(a), Income Tax Regs.Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), *526 affd. without opinion 496 F. 2d 876 (5th Cir. 1974); Nor-Cal Adjusters v. Commissioner,503 F. 2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd. 261 F. 2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Bonuses paid to employees, if paid for services and, when added to salaries, do not exceed a reasonable compensation for services, are also deductible under section 162(a)(1). Sec. 1.162-9, I/ncome Tax Regs. The question of reasonableness of the compensation is one of fact which must be answered on the basis of all the facts and circumstances in a particular case. Charles Schneider & Co. v. Commissioner,500 F. 2d 148, 151 (8th Cir. 1974), cert. denied 420 U.S. 908 (1975), affg. *527 a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F. 2d 176 (10th Cir. 1975). [10] The factors generally considered relevant in determining the reasonableness of compensation include: * * * the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers *528 the amount of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.] Commercial Iron Works v. Commissioner,166 F. 2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court; Kennedy v. Commissioner,72 T.C. 793, 801 (1979); Pepsi-Cola Bottling Co. of Salina v. Commissioner,supra at 568; No single factor is determinative. Mayson Mfg. Co. v. Commissioner,supra.Furthermore, the compensation amount will be closely examined where the payments at issue are those of a corporation to a controlling shareholder. Tulia Feedlot, Inc. v. United States,513 F.2d 800, 805 (5th Cir. 1975). Respondent's determination is presumed to be correct and petitioner has the burden of proving it otherwise. Botany Worsted Mills v. Commissioner,278 U.S. 282, 292 (1929); Rule 142(a), Tax Court Rules of Practice and Procedure.
Whether the payments were intended to be compensation purely for services is also a factual question. Paula Construction Co. v. Commissioner,58 T.C. 1055, 1059 (1972), *529 affd. without opinion 474 F. 2d 1345 (5th Cir. 1973). Regardless of the reasonableness of the total compensation paid, it is a condition precedent to the allowability of a deduction that the payments be solely for services rendered. Electric & Neon, Inc. v. Commissioner,supra at 1340. Factors considered in determining whether payments are purely for services include: (1) The corporation's history of divided payments; (2) the availability of funds for distribution; (3) a comparison of gross and net income of the corporation in relation to the compensatory amount; and (4) the method used to compute compensation. Miles-Conley Co. v. Commissioner,173 F. 2d 958 (4th Cir. 1949); Mayson Mfg. Co. v. Commissioner,supra;Klamath Medical Service Bureau v. Commissioner,supra.
Petitioner argues that because Weaver was both a salesman and a manager, the value of each of those duties must be ascertained in order to determine whether the total compensation paid to Weaver in each of the taxable years was reasonable. Under the particular facts and circumstances of this case, we agree that consideration *530 should be given to Weaver's value to petitioner both as a salesman and as chief executive officer and manager. [11] Each contributed separately to the successful profitability of petitioner's business. Weaver's sales activities produced over 50 percent of petitioner's gross receipts with a rather high gross profit margin. Weaver's executive and managerial services and activities were largely responsible for petitioner's low percentage of operating expenses to sales and to its considerable net profits. Petitioner contends that a reasonable compensation for Weaver's sales efforts is best measured by using as a guide the sales commissions paid by Southeastern and Strickland to their salesmen. Based on such commissions, petitioner asserts that Weaver's sales in fiscal years 1974 and 1975 would have earned him minimum commissions of $133,000 and $150,000, respectively. [12] Petitioner further contends that, based on petitioner's performance during each of the taxable years, as reflected in the comparison of its performance and that of Southeastern, Strickland, and the national average for paper *531 merchants, Weaver's managerial efforts were worth $100,000. Because the sum of the component amounts for each of the taxable years exceeds that compensation actually paid to Weaver, petitioner concludes that the total amount of compensation paid in each year was reasonable. Respondent argues that Weaver's compensation was unreasonable to the extent it exceeded $125,000 in each of the taxable years because the services *532 performed did not justify the compensation received. His argument is principally based on a comparison of Weaver's compensation in each of the years with: (1) The compensation paid to Weaver for similar services in years prior to those in issue; (2) the increases in petitioner's gross income and dividend distributions for the fiscal years 1970-1975; and (3) the compensation paid to Elliott as president of Strickland. For the taxable years in issue Weaver received total compensation in the respective amounts of $192,618 and $223,294. Although the agreement pursuant to which these amounts were paid was not executed until the third quarter of the first taxable year at issue and the amounts paid were considerably larger than the compensation received by Weaver in prior years, we conclude, having considered all the factors, that the compensation received by Weaver in each of the taxable years in issue was reasonable for the services performed by him. Accordingly, petitioner is entitled to a section 162(a)(1) deduction in the same amounts. As a basis for our decision, we mention only those factors which we consider most relevant. In light of Weaver's rather unique relationship with *533 petitioner, the factors we consider of major importance are: The nature of the services to be performed, their value to the employer, the responsibilities they entail, the time required of the employee in discharge of his duties, his capabilities and training, and the amount of compensation paid in proportion to net profits. See Laure v. Commissioner,70 T.C. 1087, 1098 (1978), on appeal (6th Cir. Feb. 27, 1979), a case similar to this. And, as we also said in Laure: One of the most important factors in determining the reasonableness of compensation is the amount paid to similar employees by comparable employers. * * *" The evidence presented indicates that Weaver would have earned a similar amount had he worked for an employer other than petitioner and performed the same services. The chief executive officers of two other paper merchants testified. Harris, chairman of the board of Southeastern Paper Co., testified that the several individuals who performed those jobs for Southeastern that Weaver performed for petitioner earned approximately $268,500 in 1973 and $293,500 in 1974. Additionally, Harris was impressed with the manner and efficiency with which *534 Weaver operated petitioner as reflected in the financial results achieved by petitioner in each of the taxable years. Furthermore, he was of the opinion that a salesman with sales similar in amount and quality to those of Weaver in 1975 would have earned $175,000-$180,000 for selling alone. Harris would not have required such a salesman to perform any administrative or executive duties. Based on his business judgment, Harris believed Weaver to be worth the compensation paid to him during the taxable years in issue. In a similar vein, Elliott, president of Strickland Paper Co., a witness called by respondent, was also impressed with the manner and efficiency with which Weaver operated petitioner. He testified that a salesman with sales similar in amount and quality to those of Weaver in 1975 would earn approximately $150,000. While we are aware that attempts to determine what Weaver would have earned on his sales had he worked for other companies is imprecise, nonetheless we find the testimony of Harris and Elliott very persuasive. Both witnesses were forthright and candid, and each had considerable experience in the paper industry. The companies of both witnesses used similar *535 methods to compensate their salesmen. We do not find persuasive respondent's argument that the percentage commissions paid to other salesmen were irrelevant because Weaver received a percentage of petitioner's net profits rather than a percentage of gross profits from his sales. [13] While it is certainly necessary to examine the method by which an individual is compensated, the ultimate question is whether the compensation received was reasonable for the services rendered. [14] In considering the value to petitioner of Weaver's sales efforts, it is certainly useful to know how other paper companies compensated their salesmen for similar efforts. [15] That petitioner did not compensate Weaver or its other salesmen in a similar manner, while certainly a consideration, does not diminish the usefulness of the evidence. *536 With regard to Weaver's sales activities alone, we note that the gross receipts on his accounts represented about 60 percent of the total gross receipts of petitioner for both fiscal years 1974 and 1975. His total compensation was about 7.5 percent of petitioner's gross receipts for both years and was about 12.5 percent of the gross receipts from his own accounts for both years. His total compensation was less than 50 percent of petitioner's gross profit on his own accounts, whereas Weaver received 65 percent of the gross profit of the Montgomery branch of S.P. Richards Paper Co., the management of which he took over in 1947. From these statistics it would appear that Weaver's value to petitioner as a salesman and account manager alone would almost justify the compensation he was paid in 1974 and 1975. Furthermore, Weaver's extensive and longstanding contacts with the producers of high quality paper products assured petitioner of a reliable source of supply of the variety of paper products demanded by its customers. Also, despite the rather sizable compensation paid to Weaver, his compensation was about the same or less than the taxable income reported by petitioner in each of *537 those years.
In addition to his sales duties, Weaver performed considerable management duties and he was involved in every aspect of petitioner's operation. Petitioner's success reflected Weaver's abilities and efforts. Both Harris and Elliott attested to the efficient manner with which Weaver operated petitioner. While it is true that he earned more than either Harris or Elliott, it is also true that Weaver worked considerably harder and that petitioner was a more profitable operation than either Southeastern or Strickland. (See the comparative figures set forth in the findings of fact.) Weaver performed duties for petitioner which were performed for Southeastern and Strickland by Harris and Elliott, respectively, and other employees. It is only reasonable that Weaver receive greater compensation. Furthermore, it is not unreasonable that Weaver in part be compensated for his efforts by means of a percentage of net profits arrangement because it was Weaver's efforts which were crucial in the realization of those profits. Numerous cases have approved compensation based on a percentage of profits. See Laure v. Commissioner,supra at 1100, and the cases cited *538 therein. As to the question of whether the compensation paid to Weaver was paid purely for services, there is no evidence based upon which it could reasonably be concluded that part of the compensation paid was a disguised distribution of profits. Although Weaver's bonus consisted of a percentage of petitioner's net profits, that does not mean that it was a disguised dividend. Perhaps, in a small corporation such as petitioner, one of the best measures of the value of a key employee-stockholder's services is the corporation's profitability. It is interesting to note that Elliott was also paid a bonus based on Strickland's profits. Moreover, as previously noted, many cases have approved compensation based on a percentage of profits. Laure v. Commissioner,supra.After payment of the compensation to Weaver, petitioner had considerable taxable income in each of the years in issue and it paid both income taxes and dividends. This was not a situation where a corporate officer was trying to draw off corporate earnings under the guise of salaries. See generally Boyle Fuel Co. v. Commissioner,53 T.C. 162 (1969); Klamath Medical Services Bureau v. Commissioner,supra; *539 Northlich, Stolley, Inc. v. United States,177 Ct. Cl. 435, 368 F.2d 272 (1966). In summary, we are persuaded, based on a consideration of all the factors involved, that petitioner carried its burden and established that the compensation paid to Weaver in each of the taxable years in issue was reasonable in amount and deductible pursuant to section 162(a)(1). In reaching this conclusion, we are not unmindful of those factors, particularly the amounts of compensation paid to Weaver in prior years for services similar to those performed in the years in issue, which arguably indicated that Weaver's compensation was excessive. Weaver testified that the compensation arrangement adopted by petitioner in fiscal year 1974 was intended to pay Weaver for the value of his services. Based on the evidence presented, we are convinced that the compensation paid to Weaver for his services was within the zone of reasonableness. Decision will be entered for the petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, unless otherwise indicated.↩
2. Dividends for the 1970-1974 fiscal years were $5 per share. For fiscal year 1975 the dividend increased to $15 per share.↩
3. Respondent did not disallow any deduction for a payment to a profit-sharing plan.↩
4. The job categories of the other employees were as follows: Three office workers; 4-5 paper salesmen; and 6 warehouse workers and truck drivers.↩
5. Southeastern submitted its financial data for inclusion in the industry-wide data compiled in the Paper Merchant Performance. Evidence was not introduced as to whether petitioner and Strickland also submitted their financial data. ↩
6. Complete financial data is not provided.↩
*. Specific information was not provided as to these amounts. n6a The figures for Strickland Paper Co. includes figures from three different operations: Strickland Paper Co., Birmingham; Strickland Paper Co., Mobile; and Strickland Packaging. 6b Although figures were not given, Strickland's operating expenses, as a percentage of gross receipts, equaled 20.37 percent (1974) and 22.31 percent (1975).↩
7. "Direct business" is a term used when a wholesale paper merchant places an order with the paper manufacturer and the product is shipped directly to the merchant's customer. The merchant's profit margin on such sales is low. ↩
8. The gross profit on each account varied. On a company-wide basis, Southeastern had a gross profit percentage in the low 20's.↩
9. Petitioner does not argue that the regulatory provisions which discuss contingency compensation paid pursuant to a "free bargain" between employer and employee are applicable to the bonus agreement entered into by petitioner and Weaver on Mar. 10, 1974. Sec. 1.162-7(b)(2), Income Tax Regs.↩
10. See also three of the most recent Court decisions on reasonable compensation: Kennedy v. Commissioner,72 T.C. 793 (1979); Drexel Park Pharmacy v. Commissioner,T.C. Memo. 1979-518; and Lundy Packing Co. v. Commissioner,T.C. Memo. 1979-472↩.
11. See Appelton Electric Co. v. Commissioner,T.C. Memo. 1967-211↩.
12. Petitioner calculated these figures by multiplying Weaver's sales for each of the fiscal years by petitioner's gross profit percentage (24.3 percent in fiscal year 1974; 25.24 percent in fiscal year 1975) for each of the years. The product of this multiplication was then multiplied by percentage commissions of 25 percent and 45 percent. A rough average of these two products was then made. ↩
Weaver's 1974 sales
Petitioner's gross profit margin
$1,592,624
24.3 percent
$387,007
$ 387,007
25 percent
$ 96,751
$ 387,007
45 percent
$174,153
Average
$133,000
Weaver's 1975 sales
Petitioner's gross profit margin
$1,750,393
25.24 percent
$441,799
$ 441,799
25 percent
$110,449
$ 441,799
45 percent
$198,809
Average
$150,000
13. In his original brief (p. 18) respondent argues that the formula for determining Weaver's compensation had no connection with the work performed by Weaver because Weaver "was paid a percentage of total gross sales, rather than sales attributed solely to him." It was in fact based on net profits after Weaver's base salary.↩
14. Boyle Fuel Co. v. Commissioner,53 T.C. 162, 171 (1969); cf. Appleton Electric Co. v. Commissioner,    supra.↩
15. In this regard it is recognized that a particular trade practice must not be slavishly applied in determining reasonable compensation. Ecco High Frequency Corp. v. Commissioner,167 F. 2d 583 (2d Cir. 1948), affg. a Memorandum Opinion of this Court; Miles-Conley Co. v. Commissioner,173 F. 2d 958↩ (4th Cir. 1949).