JOHN J. SCHIEF, MARY R. SCHIFF, ROBERT C. SCHIFF, ADELE SCHIFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schiff v. Commissioner
Docket No. 9567-77.
United States Tax Court
T.C. Memo 1980-578; 1980 Tax Ct. Memo LEXIS 7; 41 T.C.M. (CCH) 659; T.C.M. (RIA) 80578; December 30, 1980
*7 Held: Amounts paid to petitioner-husbands were reasonable compensation (within the meaning of sec. 162(a)(1), I.R.C. 1954), and so constituted "earned income" for purposes of the limitations on tax ("maxitax") provided by section 1348. Robert R. Lavercombe, for the petitioners. Robert J. Kastl and Rudolf L. Jansen, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual Federal income tax against petitioners as follows: Petitioners
1973
1974
John J. Schiff and Mary R. Schiff
$ 6,365.00
$ 6,713.00
Robert C. Schiff and Adele Shiff
4,951.37
4,960.00
After concessions by both sides, the issue for decision is whether amounts paid to petitioners John J. Schiff and Robert C. Schiff were reasonable compensation (within the meaning of sec. 162(a)(1)[1]) and so constituted "earned income" for purposes of the limitations on tax ("maxitax") provided by section 1348. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are *8 incorporated herein by this reference. When the petition in this case was filed, petitioners John J. Schiff (hereinafter sometimes referred to as "John") and Mary R. Schiff, husband and wife, were residents of Cincinnati, Ohio, and petitioners Robert C. Schiff (hereinafter sometimes referred to as "Robert") and Adele Schiff, husband and wife, were residents of Cincinnati, Ohio. John started work as an insurance agent in 1938, after college. After World War II, in late 1945, he returned to selling insurance. In 1946, John and Robert (John's brother) formed a partnership to sell insurance. John J. Schiff & Co., Inc. (hereinafter referred to as "the Company"), was incorporated on June 16, 1949, under Ohio law. The Company's subchapter S election (sec. 1372) was made on December 1, 1958. The Company continued to be an electing small business corporation through 1974. From January 1, 1965, through 1974, the Company's stock has been held as shown in table 1. Table 1 Number of
Original Cost
Percentage of
Shareholder
Shares Held
of Stock
Stock Ownership
John
65
$ 13,000
50
Robert
65
$ 13,000
50
As of December 31, 1973, the basis in the stock of the Company held by John and Robert was zero. During *9 1973 and 1974, John was chairman of the board of the Company and Robert was president of the Company. During 1973 and 1974, the Company was an insurance agency; its business was virtually entirely the sale of insurance and it derived more than 98 percent of its income from commissions on the sales of insurance policies and from contingent commissions. The Company sold various types of insurance, including home and auto casualty and liability insurance, directors' and officers' liability insurance, and insurance on government properties. The Company operated in the Greater Cincinnati area. The Company utilized the accrual method of accounting in maintaining its books and records; it filed its Form 1120 tax returns on a calendar year basis.
As a result of the election under section 1372, John and Robert each reported income or losses from the Company on their Federal income tax returns (or amended returns), as shown in table 2. Table 2 Year
Income or (Loss) Reported
1969
0
1970
$ 1,603
1971
1,614
1972
(3,723)
1973
( 895)
1974
1,325
The Company's total income as shown on its returns for 1973 and 1974, respectively, consisted of the amounts shown in table 3. Table 3 1973
1974
Commissions
$ 406,511
$ 452,361
Contingent commissions
100,479
103,000
Dividends
7,145
910
Repaid corporation expenses
1,079
1,411
Miscellaneous
795
9,119
$ 516,009
$ 566,801
The *10 Company paid commissions to its producers based on the Company's commission income, which in turn was based on the premiums paid on sales of insurance by that producer, including renewals and new business. The commissions paid by the Company to any producer were unaffected by the losses sustained by the insurance companies on the policies sold by that producer. (See discussion of contingent commissions and table 5, infra.) The Company paid commissions during 1972, 1973, and 1974, as shown in table 4. Table 4 Premiums received
from all
Producer
insurance in effect * *11 Commissions
Percent
1972 John
$ 728,558
$ 80,352
11.0
Robert
529,024
60,148
11.4
John Schiff, Jr.
287,416
31,539
11.0
Talmadge Brannon
304,453
32,827
10.8
Thomas Schiff
80,140
10,300
12.9
$ 215,166
1973 John
$ 641,583
$ 80,199
12.5
Robert
558,829
69,683 **
12.5
John Schiff, Jr.
349,364
36,377
10.4
Talmadge Brannon
331,447
36,302
11.0
Thomas Schiff
131,040
14,400
11.0
Daniel A. Brannon
39,595
9,600
24.2
$ 246,561
1974 John
$ 732,227
$ 86,852
11.9
Robert
645,654
76,266
11.8
John Schiff, Jr.
357,702
39,801
11.1
Talmadge Brannon
350,498
39,368
11.2
Thomas Schiff
177,654
16,000
9.0
Daniel A. Brannon
76,860
12,000
15.6
$ 270,287
John and Robert set the commission rates for the Company's producers. The commission rates for each producer varied; those for John and Robert were usually somewhat higher than any of those for the other producers. Commission rates in general were declining during the years in issue, as premiums were rising. Commission rates set by the Company for its producers were competitive within the industry. Included in the Company's commissions income (table 3, supra) is income from "house accounts" in the amounts of $ 15,016 and $ 10,222 for 1973 and 1974, respectively. House accounts are sales which have been generated for the Company but which are not attributable to any particular producer's efforts, such as public insurance put out on a bid basis. No individual producer was deemed to have earned any commission with respect to house accounts. The Company's contingent commissions income (table 3, supra) arose from a custom of big insurance companies to pay additional amounts (i.e., in addition to regular commissions) to their larger agencies, based on the insurance company's profit on *12 the business brought in by the agency. The amount of such a payment is calculated under a formula in a contract between the insurance company and the agency. During 1973 and 1974, as in prior years, the Company was a party to such a contingent commissions contract with the Cincinnati Insurance Company (hereinafter referred to as "CIC"). The Company received contingent commissions from CIC in 1973 (largely on account of 1972) and 1974 (largely on account of 1973). The formula that resulted in the contingent commissions in 1973 and 1974 was based on the operations of the Company as a whole and was not computed by CIC with respect to any one producer. The formula gave significant weight to the losses suffered by CIC on policies sold by the Company. Other important factors were (1) the promptness with which the Company transmitted to CIC the premiums it collected and (2) the volume of business the Company produced for CIC. Table 5 compares the loss ratios and business volumes of John and Robert with those of the other producers in the Company for 1972, 1973, and 1974. The statistics for 1972 and 1973 largely determined the contingent commissions for 1973 and 1974, respectively. *13 Table 5 Premiums received
from all
Loss
insurance in effect
Losses
Ratios
1972 John
$ 728,558
$ 190,662
26.2
Robert
529,024
154,121
29.1
John Schiff, Jr.
287,416
167,373
58.2
Talmadge Brannon
304,453
124,524
40.9
Thomas Schiff
80,140
53,528
66.8
1973 John
$ 641,583
$ 207,148
32.3
Robert
558,829
141,475
25.3
John Schiff, Jr.
349,364
191,662
54.9
Talmadge Brannon
331,447
145,246
43.8
Thomas Schiff
131,040
44,801
34.2
Daniel A. Brannon
39,595
8,316
21.0
1974 John
$ 732,227
$ 721,610
98.6
Robert
645,654
425,001
65.8
John Schiff, Jr.
357,702
508,730
142.2
Talmadge Brannon
350,498
597,105
170.4
Thomas Schiff
177,654
179,423
101.0
Daniel A. Brannon
76,860
120,842
157.2
Prompt transmittal of collected premiums by the Company to CIC (another factor in earning contingent commissions income for the Company) was a management function for which John and Robert were responsible; it was not a matter over which an individual producer had control. Dividends shown in table 3, supra, resulted from investment of the Company's surplus funds. Investment was a management function for which John and Robert were responsible; this was a minor part of their duties in 1973 and 1974. Repaid corporation expenses shown in table 3, supra, were reimbursements by insurance companies *14 of certain expenses incurred by the Company. Miscellaneous receipts shown in table 3, supra, were receipts of the Company of an unknown nature which are not classifiable under the other categories. On its Form 1120S information returns, the Company reported year-end net assets as shown in table 6. Table 6 1969
$ 8,294
1970
7,806
1971
6,988
1972
10,859
1973
13,625
1974
12,110
In 1973 and 1974, in addition to John, Robert, and the other producers, an office manager and six or seven other office employees were on the Company's payroll. The office manager supervised the day-to-day office work and also provided technical assistance to the Company's producers when they were selling commercial accounts. In 1950, John, Robert, and two others chartered CIC, which was initially a fire insurance company. In 1955 it was changed to a multiple line company. During 1973 and 1974 CIC was a subsidiary of Cincinnati Financial Corporation; John was president of both CIC and Cincinnati Financial Corporation and was president or chairman of the board of four other corporations that were members of the same affiliated group as CIC and Cincinnati Financial Corporation; and Robert was vice president of CIC. The *15 affiliated group paid John compensation of $ 60,836 for 1973 and $ 76,000 for 1974. CIC paid Robert compensation of $ 33,528 for 1973 and $ 39,000 for 1974. The Company's offices and those of CIC were located in the same building. About 85 or 90 percent of the Company's sales of insurance were of CIC policies. In 1957, John and Robert developed an innovative homeowner's automobile package insurance policy, which combined coverage for home and automobile in one policy. This package insurance was written by CIC and sold by the Company from 1957 through 1974. Also in 1957, John and Robert developed a renewal certificate invoice, which evidences the renewal of a policy upon the insured's receipt of an invoice, thereby obviating the necessity of reissuing the insurance policy. Use of the renewal certificate invoice reduced by one-half the time otherwise required to renew an insurance policy; this time reduction eliminated substantial expense for the Company and created more time for the producers to sell more insurance. The Company's reputation and goodwill in Cincinnati was a substantial positive factor with respect to all the producers' sales of insurance. During 1973 and 1974, *16 and prior years, John and Robert had other duties to the Company in addition to their duties as producers. They negotiated for the Company with CIC and other insurance companies. They trained other producers in the sale of various kinds of insurance. They dealt with policyholders who reported claims. They hired and fired the Company's employees. They made the investment decisions as to the Company's surplus funds. They made the advertising, direct mail, and sales campaign decisions for the Company. They supervised other producers with respect to collection of premiums from persons to whom the other producers had sold insurance; each producer, including John and Robert, was responsible for the collection of those premiums. John and Robert were responsible for the Company's credit and collection policies. In addition to the commissions set forth in table 4, supra, the Company paid John and Robert amounts characterized as "bonuses" as shown in table 7. Table 7 John
Robert
1973
January 30
$ 25,000
0
February 1
5,000
0
February 28
0
$ 30,000
March 10
30,000
30,000
October 15
6,000
0
$ 66,000
$ 60,000
1974
February
$ 55,000
$ 55,000
May
5,000
0
December
10,000
10,000
$ 70,000
$ 65,000
Neither Federal income taxes *17 nor FICA contributions were withheld from the bonuses. From 1969 through 1974, no formal written board of directors' resolutions were maintained by the Company authorizing the payment of any bonuses to John or Robert. No bonuses were paid to any other producers in 1973 or 1974; $ 500 bonuses were paid to some other producers in earlier years. The amounts of the bonuses were determined from time to time by John and Robert, in consultation with each other. The amounts were not calculated on the basis of a predetermined formula. The amounts and timing of the bonuses were affected by John's and Robert's "conservative" estimates of the Company's profitability and its cash flow needs. The commissions and bonuses paid by the Company to John and Robert constituted, in their entirety, payments of compensation for personal services actually rendered by John and Robert to the Company; these payments were reasonable in amount. OPINION Petitioners reported on their Federal income tax returns, and respondent determined, the amounts of compensation and dividends from the Company shown in table 8. [2] *18 Table 8 John
Robert
Petitioners
Respondent
Petitioners
Respondent
1973
Commissions
$ 80,199
$ 80,199
$ 69,317
$ 69,317
Bonuses
66,000
17,686
60,000
26,530
Reasonable
compensation
146,199
97,885
129,317
95,847
Dividends
0
48,314
0
33,470
1974
Commissions
$ 86,852
$ 86,851
$ 76,266
$ 76,267
Bonuses
70,000
20,123
65,000
30,182
Reasonable
compensation
156,852
106,974
141,266
106,449
Dividends
0
49,878
0
34,817 Petitioners maintain that the amounts paid to John and Robert by the Company were paid for services actually rendered and were reasonable in amount, within the meaning of section 162(a)(1). They argue that these amounts thus constitute "earned income" for purposes of the limitations on tax provided by section 1348. *19 Respondent maintains that any amounts paid to John and Robert in excess of $ 97,885 and $ 95,847, respectively, for 1973, and $ 106,974 and $ 106,449, respectively, for 1974, were unreasonable in amount and not payments purely for services. Respondent maintains, in the alternative, that even if the amounts were reasonable the payments nevertheless were disguised distributions of earnings. Respondent argues that these excess amounts are not deductible under section 162(a)(1), that they are not "earned income" under section 911(b), and that therefore they are not eligible for the limitations on tax provided by section 1348. Petitioners reply that any such excess (if it exists) was nevertheless paid as compensation and so constitutes earned income within the meaning of section 1348. We agree with petitioners that the amounts in dispute were reasonable compensation and constitute earned income within the meaning of section 1348. Section 1348, enacted by section 801(a) of the Tax Reform Act of 1969 (Pub. L. 91-172, 83 Stat. 685), provides that the marginal tax rate applicable to an individual's earned income is not to exceed 50 percent. "Earned income" is defined in section 1348(b)(1) *20 as "any income which is earned income within the meaning of * * * section 911(b) * * *." [3]
The parties do not dispute that, under section 911(b), [4] *21 to the extent the amounts paid to John or Robert are deductible by the Company under section 162(a)(1)[5] as reasonable compensation for services actually rendered, these amounts constitute earned income within the meaning of section 1348(b)(1). See Kennedy v. Commissioner, 72 T.C. 793, 805 (1979), on appeal (CA6 March 14, 1980). See also Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1154 (1980). The initial task, then, is to determine how much of the amounts so paid are so deductible. [6] *22 The question of reasonableness is one of fact which must be resolved on the basis of all the facts and circumstances in the case. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 528 F.2d 176, 179 (CA10 1975), affg. 61 T.C. 564 (1974); Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 605 (CA9 1968), affg. a Memorandum Opinion of this Court; [7]Home Interiors and Gifts, Inc. v. Commissioner, 73 T.C. at 1155; Kennedy v. Commissioner, 72 T.C. at 801; Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 711 (1977). Discerning the intent behind the payments also presents a factual question to be resolved within the bounds of the individual case. Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (CA9 1974), affg. *23 a Memorandum Opinion of this Court; [8]Kennedy v. Commissioner, supra; Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1059 (1972), affd. without opinion 474 F.2d 1345 (CA5 1973). The two elements of a reasonable compensation issue--"reasonable" and "compensation"--are often interwined and analyzed as one. See Kennedy v. Commissioner, 72 T.C. at 801-805. Where officer-shareholders, who are in control of a corporation, set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits. Logan Lumber Co. v. Commissioner, 365 F.2d 846, 851 (CA5 1966), affg. on this issue a Memorandum Opinion of this Court; [9]Miles-Conley Co. v. Commissioner, 173 F.2d 958, 960 (CA4 1949), affg. 10 T.C. 754 (1948); Kennedy v. Commissioner, 72 T.C. at 803; Levenson & Klein, Inc. v. Commissioner, supra.
Many factors are relevant in determining whether amounts paid were reasonable compensation, but to single factor is decisive; rather, we must consider and weigh the totality of facts and circumstances in arriving at our decision. Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (CA6 1949), *24 revg. an unreported Memorandum Opinion of this Court. Although we have considered all the factors noted in Mayson, we mention here only those most significant to our decision. We do not know what circumstances induced respondent to conclude that the sums of bonuses and commissions paid were unreasonable and not compensation but that approximately two-thirds (as to John) and three-fourths (as to Robert) of these sums were reasonable compensation. However that may be, respondent's determination must be deemed prima facie correct and petitioners are charged with the burden of establishing that the bonuses and commissions paid were reasonable compensation for the services performed by John and Robert. Laure v. Commissioner, 70 T.C. 1087, 1097 (1978), on appeal (CA6 Feb. 27, 1979); Levenson & Klein, Inc. v. Commissioner, supra; Shield Co. v. Commissioner, 2 T.C. 763, 769-770 (1943). On the basis of the record as a whole, we conclude that petitioners have adequately demonstrated that the sums of bonuses and commissions paid were reasonable compensation. The following indicia of "reasonable compensation" appear in this case: (1) Large volumes of business increased the Company's contingent *25 commissions income. John and Robert each produced far more business than any of the other producers. See table 4, supra. (2) Small losses on large volumes increased the Company's contingent commissions income. The business produced by John and Robert resulted in more favorable loss experience than the business produced by the other producers. (See table 5, supra.) (3) Prompt transmittal of premiums to CIC increased the Company's contingent commissions income. John and Robert were responsible for complying with CIC's requirements in this regard. (4) John and Robert supervised the training, sales, and credit activities of the other producers. The record does not show any of the other producers as being engaged in such supervisory activities. (5) John and Robert negotiated with CIC and other insurance companies on behalf of the Company. The record does not show any of the other producers as being engaged in such representative sales. (6) The amounts of neither the commissions, nor the bonuses, nor the "dividends" as determined by respondent were in proportion to John's and Robert's shareholdings. The following indicia of unreasonableness of compensation, or distribution of profits, *26 appear in this case: (1) Bonus amounts were not set in accordance with any formula or other detailed arrangement agreed upon in advance. (2) John and Robert made "conservative" estimates of profitability and cash flow before determining the amounts of the bonuses. (3) The bonus payments were not subjected to withholding of either income or FICA taxes. (4) The Company's dividends and undistributed taxable income were small. (On the other hand, the Company's capital assets also were small (see table 6, supra), leading to the conclusion that little of the Company's income was fairly attributable to shareholders' investment.) In attempting to evaluate the record before us, we note the following: (1) both sides agreed that evidence is unnecessary as to compensation of people performing comparable services for other corporations and so they presented no such evidence; (2) neither side presented any expert witnesses (indeed, respondent presented no witnesses at all); and (3) neither side explained how it arrived at the numbers that that side continues to press us to agree to. See Mayson Mfg. Co. v. Commissioner, 178 F.2d at 121. On the basis of the record herein, we conclude that the *27 amounts paid did not exceed reasonable compensations for John or Robert, as the case may be. Respondent determined that portions of the bonuses were intended to be paid as compensation. As far as we can tell from the record herein, the payor (the Company) did not have different intentions as to certain parts of the bonus payments that it had as to other parts of the bonus payments. On the basis of the record herein, although the matter is a close call, we conclude that the entire amounts in dispute were paid as compensation. [10] See Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). On this issue we hold for petitioners. Since we have concluded that all of the disputed sums constituted payments of reasonable compensation, deductible by the Company under section 162(a)(1), it is not necessary to examine whether any of these sums could constitute "earned income" under section 1348(b)(1) even if not so deductible. See section 1373(b); *28 Garrison v. Commissioner, 52 T.C. 281 (1969); Sterno Sales Corporation v. United States, 170 Ct. Cl. 506, 345 F.2d 552, 554 (1965). To take account of concessions by all the parties, Decision will be entered under Rule 155. Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
*. Receipts in the calendar year by the Company of premiums on outstanding policies identifiable with the specified individual producer. ** Compare table 8 and note 2, infra↩.
2. The totals do not include the $ 7 John and Robert each reported as dividend income from the Company for each of the years, nor do they include the income or losses set forth in table 2, supra. The parties do not explain the differences of $ 1 in their 1974 commission amounts for John and Robert; nor do they explain why for 1974 John reported $ 369 more and Robert reported $ 364 more than the amounts on their respective Forms W-2; nor do they explain why Robert's 1973 Federal income tax return and the notice of deficiency both set forth commission totals $ 366 less than the stipulated total (see table 4, supra↩).
3. Subsequent amendments of this provision (changing "earned income" to "personal service income" and revising the definition), by section 302(a) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1554, and by sections 442(a) and 701(x)(1) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2878, 2920, do not affect the instant case.↩
4. SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (b) Definition of Earned Income.--For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. * * * [The subsequent amendments of the section heading (by sec. 202(f)(1) of the Foreign Earned Income Act of 1978, Pub. L. 95-615, 92 Stat. 3098) and of subsection (b) (by sec. 1906(b)(14)(A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1834) do not affect the instant case.] ↩
5. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered.↩
6. Although the Company contributed an aggregate of $ 10,000 to the John J. Schiff Agency Pension Plan for John and Robert in 1973 and 194 ($ 2,500 for each of them each year), respondent has not included the amounts of these contributions in his determinations of either the deductible compensation or the nondeductible distributions. See, e.g., Edwin's, Inc. v. United States, 501 F.2d 675, 679 (CA7 1974); Charles E. Smith & Sons Co. v. Commissioner, 184 F.2d 1011, 1014 (CA6 1950), affg. an unreported Memorandum Opinion of this Court; LaMastro v. Commissioner, 72 T.C. 377, 382-383 (1979); sec. 1.404(a)-1(b), Income Tax Regs.↩ Under the circumstances we, too, will ignore these contributions.
7. T.C. Memo. 1967-7↩. 8. T.C. Memo. 1971-200↩.
9. T.C. Memo. 1964-126↩.
10. We express no opinion as to what our conclusion might have been if the Company's dividend income for the years before the Court had aggregated more than the 3/4 of one percent of the Company's total income shown in table 3, supra↩.